Jean W. HUNT, Respondent,

v.

ESTATE OF Arthur Elmer HANSON
and Bertha Hanson, Appellants.

No. C8–84–191.

Court of Appeals of Minnesota.

Oct. 9, 1984.

Review Denied Jan. 9, 1985.

Martin Berg, Roseau, for respondent.

Dennis M. Sobolik, Brink, Sobolik, Severson, Vroom & Malm, P.A., Hallock, for appellants.

Heard, considered and decided by PARKER, P.J., and FOLEY and HUSPENI, JJ.

## OPINION

FOLEY, Judge.

Appellants-Estate of Arthur Elmer Hanson and Bertha Hanson (Hansons), appeal from a judgment entered on a jury verdict in favor of respondent-Jean W. Hunt and from the trial court's order denying the Hansons' motion for judgment notwithstanding the verdict or in the alternative for a new trial. The jury found that the Hansons used their farmland unreasonably so as to interfere with the flow of water on Hunt's farmland, causing him damages. Pursuant to the jury's verdict, the trial court entered a mandamus injunction in favor of Hunt. We affirm in part and reverse in part.

## FACTS

Jean Hunt farms 200 acres of land in Hampden Township including the northwest quarter of section 36. In 1966, Arthur E. Hanson (now deceased) and Bertha Hanson purchased a part of section 35 lying east of Highway 75. The Hansons have farmed this land since that time.

On sections 35 and 36, there is a watercourse or coulee that carries surface waters across portions of the land and provides a natural drain to the west. Before the Hansons purchased the land in section 35, the coulee was maintained as a "grassy waterway." After the Hansons purchased the land, they began farming close up to the coulee, gradually plowing it farther and farther back. The Hansons plowed across the coulee for the purpose of draining the land in section 35 more quickly and drying it out for farmland.

In the early 1970's, Hunt began experiencing water drainage problems on the northwest portion of section 36 for the first time in his memory. He noticed that water was not draining through the culverts and was backing up onto the land, standing for as much as a week when it rained.

Sometime between 1974 and 1976, Hunt went to Hanson, and told him that water was backing up onto his land causing crop and land damage and asked him for his help in working out a drainage system for the coulee. Hanson did not agree to help and told Hunt that he thought the problem stemmed from a lack of culvert capacity.

Throughout the 1970's and early 1980's, Hunt's drainage problems became progressively worse. In late 1979, Hunt again approached the Hansons and asked them to deepen and straighten the coulee on their land in order to improve the drainage. The

Hansons denied that their farming practices were causing Hunt's water problems and continued to plow and cultivate the coulee area as before.

Because of the excessive amount of standing water which existed on portions of section 36, Hunt suffered crop loss during a period between 1976 and 1983 when he brought this action. He did not keep records of his production during that time period so he estimated the amount of his crop loss based upon his recollection of acreage damaged per year. Hunt also testified that he suffered damages in the fair rental value of his entire 200 acres during the same time period because of the water problem.

### ISSUES

1. Was the jury verdict the product of sufficient evidence?

2. Did the jury instructions on the flow of water misstate the rule of law to be applied in this case?

3. Were the jury instructions *regarding* damages correct?

4. Did the trial court err by not submitting the question of punitive damages to the jury?

### ANALYSIS

#### I.

The Hansons contend that the jury verdict must be overturned as the product of incompetent or insufficient evidence. They claim that engineering survey results, introduced into evidence through their expert witness, Robert Muscha, show that they did not cause the harm of which Hunt complains. Muscha, a consulting engineer, testified that he was not aware of any farming practice used by the Hansons that could place enough soil in the coulee to cause the water problem on Hunt's land.

Hunt presented conflicting testimony through *his* expert witness, Bruce Nielsen, a geologist. Nielsen testified that the water problem resulted from blockage not flow restriction caused by inadequate culvert capacity, as the Hansons claimed. He testified that the natural drainage slope had been changed by moving soil from the shoulders of the coulee into it, probably by tilling the soil across it. Nielsen concluded that the Hansons' tillage practices caused a buildup of the soil on the coulee bottom causing the water problem on Hunt's land.

The weight and credibility of expert testimony is for the jury. *Shymanski v. Nash,* 312 Minn. 304, 308, 251 N.W.2d 854, 857 (1977). Where conflicting opinions of expert witnesses have a reasonable basis in fact, it must be left to the trier of fact to decide who is right and the decision will not be overturned on appeal. *Id. See also, Sandhofer v. Abbott-Northwestern Hospital,* 283 N.W.2d 362, 367 (1979); and *Hiber v. City of St. Paul,* 219 Minn. 87, 93, 16 N.W.2d 878, 881 (1944). In this case, evidence presented by Hunt's expert was clearly based in fact, that is, survey results and scientific observation. The jury chose to believe respondent's expert and their finding will not be overturned.

The Hansons also argue that the jury's verdict should be overturned because the weight of the evidence shows that their farming practices were customary and reasonable. First, the Hansons' right to use their land is conditional. Regardless of whether the water at issue is surface water or part of a natural watercourse, the Hansons may not use their land in a way that unreasonably injures their neighbor. *See, e.g., McClure v. The City of Red Wing,* 28 Minn. 186, 9 N.W. 767 (1881); *Poynter v. County of Otter Tail,* 223 Minn. 121, 25 N.W.2d 708 (1947); *Pell v. Nelson,* 294 Minn. 363, 201 N.W.2d 136 (1972); and *Fink v. O'Neill Country Club,* 218 Neb. 30, 352 N.W.2d 166 (1984).

Secondly, we note that the prevailing standard for reviewing jury verdicts in Minnesota is limited:

> In reviewing jury verdicts, we permit ourselves only a limited role. All testimony must be considered in the light most favorable to the prevailing party, * * * and a verdict will only be disturbed

if it is "manifestly and palpably contrary to the evidence." * * * Review is even more limited when the jury verdict must consider the demeanor of the witnesses. (Citations omitted.) *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 256 (Minn. 1980).

■ The evidence in this case shows that the Hansons farmed across the coulee and in so doing partially filled it in with soil. The jury chose to believe Hunt's expert who said that these practices could have caused the water problems on his land. Considering the testimony in the light most favorable to the prevailing party, the jury's decision that the Hansons are liable for the damage to Hunt's crops or land is not manifestly and palpably contrary to the evidence.

## II.

The Hansons contend that the water which is the subject of this action is surface water and not a natural watercourse. They further contend that the trial court incorrectly instructed the jury on the rule of law governing natural watercourses instead of the reasonable-use rule for surface water.

"Minnesota follows the 'rule of reasonable use' with regard to diversion or obstruction of surface water." *Enderson v. Kelehan*, 226 Minn. 163, 167–168, 32 N.W.2d 286, 289 (1948).

> [T]he rule is that in effecting a reasonable use for a legitimate purpose a landowner, acting in good faith, may drain his land of surface waters and cast them as a burden upon the land of another, although such drainage carries with it some waters which would otherwise have never gone that way * * * if
>
> (a) There is a reasonable necessity for such drainage;
>
> (b) If reasonable care be taken to avoid unnecessary injury to the land receiving the burden;
>
> (c) If the utility or benefit accruing to the land drained reasonably outweighs the gravity of the harm resulting to the land receiving the burden; and

> (d) If, where practicable, it is accomplished by reasonably improving and aiding the normal and natural system of drainage according to its reasonable carrying capacity, *or* if, in the absence of a practicable natural drain, a reasonable and feasible artificial drainage system is adopted.

*Id.*

■ The trial court's jury instruction appears to combine the law governing natural watercourses and surface water. The instruction begins with the statement that "* * * an owner of land has a right to have the water flowing in a natural waterway, watercourse, coulee, draw or drain to flow unimpeded and without obstruction * * *." This statement does not accurately reflect the law on drainage of surface waters. However, the remainder of the instruction states the elements of the reasonable-use rule. The relevant portions of that instruction are as follows:

> * * * [D]ownstream owners or possessors of land may not impede or obstruct the flow of water in a natural watercourse if such obstruction or impeding unnecessarily or unreasonably exposes his neighbor to injury and that such injury exceeds or outweighs any benefit to the owner causing the water flow to be obstructed.
>
> *       *       *       *       *       *
>
> Owners making such improvements that may affect the drainage of their neighbor's land may effect such changes only if there is a reasonable necessity for making the improvement and must take reasonable care to avoid doing injury or damage to adjoining land and the improvements must result in benefits greater than the harm if any to the adjoining landowners.

A complete reading of the jury instruction makes it clear that the jury was instructed to consider the evidence under the reasonable use standard.

Furthermore, Hunt disputes the Hansons' contention that the waters involved are surface waters. He claims that they

are part of a natural waterway and therefore an even more stringent instruction regarding the Hansons' rights and duties was justified.

" 'Surface waters' consist of waters from rain, springs, or melting snow which lie or flow on the surface of the earth but which do not form part of a well-defined body of water or natural watercourse." *Enderson v. Kelehan*, 226 Minn. 163, 167, 32 N.W.2d 286, 288–289 (1948). "In order to constitute a 'natural watercourse' the flow ordinarily *must have some substantial permanency and continuity* and must be a part of a well-defined stream or body of water." *Collins v. Wickland*, 251 Minn. 419, 422–423, 88 N.W.2d 83, 86 (1958). (Emphasis in original.) Hunt argues that the evidence shows that the water involved in this case is an intermittent tributary to the North Branch of the Two Rivers and thus is a natural waterway.

■ The record is not entirely clear as to the correct characterization of the water at issue. At several points throughout the trial, the terms coulee, swale, draw, and watercourse or waterway were used in the same sentence or interchangeably. These terms do not describe the same thing. However, on appeal, the court must view all facts in the light most favorable to the prevailing party. *Edin v. Josten's, Inc.*, 343 N.W.2d 691 (Minn.Ct.App.1984). Under this approach the facts support the view that the water is part of an intermittent tributary and therefore a natural watercourse.

We agree with Hunt's argument that since the water was found to be a natural watercourse, he was entitled to a stronger instruction as to the Hansons' duties than that actually given. Thus, if any error in the jury instructions occurred, it was to the Hansons' advantage and no ground for their complaint exists.

### III.

The Hansons assert that the trial court erred in its instructions to the jury regarding damages because it did not follow the rule of *Poynter v. County of Otter Tail*, 223 Minn. 121, 25 N.W.2d 708 (1947), on valuing loss of crops destroyed by water. We agree.

■ The trial court instructed the jury that if they decided respondent was entitled to damages, they should award "the reasonable market value of the crops lost in the years that the land was actually seeded and was lost due to flooding" or loss of fair rental value for Hunt's farm. This instruction was improper because it conflicts with the prevailing rule set forth in *Poynter*, 223 Minn. at 132–133, 25 N.W.2d at 715:

> The second objection raised with respect to the court's ruling relative to damages is in connection with testimony as to the value of crops allegedly damaged as the result of the flooding of plaintiff's fields. The proper rule in such a situation and one well established in this state is that the evidence, in order to be competent, must be directed to the value of the crops as they were standing at the time and place of their destruction and damage.

> \* \* \* \* \* \*

> Clearly, valuation of crops of oats, barley, and corn based upon the assumption that they will mature and be harvested may differ considerably from the valuation of such crops as they stand in the fields in the early part of the growing season, \* \* \*.

■ Because the instruction given by the trial court constitutes a total departure from this rule, any monetary award cannot stand. Since the jury was given a general verdict form, it is impossible to determine whether damages were awarded for crop loss or loss of rental value, or some combination. Therefore, the error here requires a new trial on the question of monetary damages. *See Raymond v. Baehr*, 282 Minn. 109, 113, 163 N.W.2d 51, 54 (1968). If the court uses a general verdict form in the second trial, it might be advisable to

add interrogatories to clarify how damages are awarded.[1]

The Hansons also raised issues regarding the scope of the trial court's instruction on the decrease in rental value of the property and the propriety of admitting respondent's evidence on damages. Because a new trial is necessary on the issue of damages, we need not consider these arguments.

## IV.

Hunt argues that the trial court erred in denying his request for jury instructions on the issue of punitive damages. Hunt's request for punitive damages arises out of an intentional tort claim in his complaint. However, the trial court granted the Hansons' motion for a directed verdict on the intentional tort cause of action after Hunt's case-in-chief.

Hunt did not raise as an issue the directed verdict on the intentional tort claim in his notice of review. He indicated that he would seek review of the trial court's refusal to instruct the jury on the issue of punitive damages only. However, the issue of punitive damages depends for its existence on the intentional tort claim. *See Terfehr v. Kleinfehn*, 352 N.W.2d 470, 474 (Minn.Ct.App.1984). Since the intentional tort claim was removed from the case and a timely appeal was not taken from it, the issue of punitive damages was improperly raised and under Minn.R.Civ.App.P. 106, it, along with the intentional tort issue is waived. *See Ford v. Chicago, M., St. P. and P.R. Co.*, 294 N.W.2d 844, 845 (Minn. 1980).

## DECISION

The evidence was sufficient to sustain the jury's verdict as to the Hansons' liability. Any error in the trial court's jury instructions regarding the nature of the waters as part of a natural watercourse or surface waters benefitted the Hansons.

The trial court's instruction on the measure of damages for crop loss due to water damage was a total departure from the prevailing rule and constitutes reversible error.

Affirmed in part; reversed and remanded for retrial on the issue of compensatory damages only.

1. The Hansons also argued that the trial court's jury instruction on both decrease in rental value and loss of crops violated its' own directive on election of remedies and was improper. We agree. Whether or not this error alone justifies reversal, it is a compounding factor in our decision to reverse and remand for re-trial on the issue of damages.