Laurel J. **KALSBECK**, as trustee for the next of kin of Thomas D. Kalsbeck, decedent, Appellant,

v.

**WESTVIEW CLINIC, P.A.**, et al., Respondents.

No. C1–85–446.

Court of Appeals of Minnesota.

Oct. 22, 1985.

Review Denied Dec. 30, 1985.

Terry L. Wade, David McKenna, St. Paul, for appellant.

Terence J. O'Loughlin, St. Paul, for respondents.

Heard, considered and decided by LANSING, P.J., and PARKER and RANDALL, JJ.

## OPINION

RANDALL, Judge.

In this medical malpractice action, plaintiff appeals from the trial court's order denying a new trial and from the judgment entered following a jury verdict for defendant. Appellant contends that the trial court erred in refusing to give certain requested jury instructions, and that the verdict was not supported by the evidence. We affirm.

## FACTS

Appellant's decedent, her husband Thomas Kalsbeck (Kalsbeck), died on January 27, 1983, after a short illness. He was 47 years old. While the direct cause of death was cardiac arrest, the death certificate and the attending physician's death summary indicate the following final diagnosis:

1. Overwhelming pneumonia, penicillin-resistant staphylococci;

2. Diabetes mellitus, out of control;

3. Respiratory arrest, secondary to No. 1 and No. 2;

4. Cerebral anoxia and resulting coma, secondary to No. 3;

5. Repeated cardiac arrests secondary to Nos. 3 and 4.

The events of the few days preceding Kalsbeck's death are as follows: Kalsbeck and appellant were examined by their family doctor, respondent Dr. James Haight, on January 24, 1983, a Monday. Both Kalsbeck and appellant had been ill since the previous Thursday. Appellant described their symptoms as including sore throats, coughing, and a general aching "down to the bone." By Monday, Kalsbeck was suffering more than appellant. He was congested, coughing, and had even coughed up some blood that morning. His right side was painful, making it difficult to cough.

According to Dr. Haight, however, Kalsbeck did not look "that sick," and the doctor was surprised when x-rays showed pneumonia. Dr. Haight testified that his impression at the time of the office visit was that Kalsbeck's pneumonia was probably viral rather than bacterial. Pneumonia caused by a viral organism cannot be treated effectively by antibiotics or medication of any kind. Dr. Haight favored viral pneumonia because Kalsbeck's white blood count was normal. This count is usually elevated with bacterial pneumonia. However, the blood test also disclosed a "shift to the left" of the differential count, which caused Dr. Haight to believe it was possible the pneumonia was bacterial. He therefore decided to treat Kalsbeck with two antibiotics—Bicillin, which was injected in the office, and Ampicillin, which was prescribed. These two antibiotics are ordinarily effective against approximately 80–90% of the bacteria which cause pneumonia. They are *not* effective against most types of staphylococcal bacterial pneumonia (staph), which was the type of pneumonia that was ultimately diagnosed after Kalsbeck was admitted to the hospital, and which is listed on the death summary as the primary cause of death.

Viral pneumonias account for approximately 50% of all pneumonias. Of the bacterial pneumonias that make up the remaining 50%, only 1–3% are staph. That figure may actually be even lower for patients such as Kalsbeck, since staph acquired by

already hospitalized patients constitutes most of its occurrences. In fact, of the 4 family practitioners who gave expert testimony, only one had ever diagnosed a case of non-hospital acquired staph, even though each of them had at least 10 years experience. Dr. Haight had never seen a patient with staph, and he testified that it never occurred to him that Kalsbeck might have staph.

Expert testimony established that the incidence of staph increases following a bout of influenza. While one testifying doctor stated that he believed that the Kalsbecks had influenza, other experts disputed his conclusion, and testified that the illness could have been the common cold. In any case, Dr. Haight testified that he was not aware of the increase of staph following influenza.

An additional and essential element of Kalsbeck's condition is that he was diabetic. He contracted diabetes only 3 years earlier, at the age of 44, and was therefore a Type II, or adult-onset diabetic. Type II diabetics have residual pancreatic function, and so their bodies continue to produce some insulin. These diabetics may or may not require additional insulin to supplement their natural supply. Type I, or juvenile diabetes, is acquired in childhood and involves an absolute absence of insulin. These diabetics have no reserve capacity to produce insulin, and they react quickly and strongly to excess insulin as well as to the lack of insulin. Their blood sugar levels are usually more volatile than those of a Type II diabetic.

Kalsbeck was an insulin dependent Type II diabetic. This may have been at least partially due to his mild obesity, which adds stress to the body and can cause the diabetic's insulin requirement to increase. If Kalsbeck had been within the normal weight limits for his age, he might not have needed insulin.

A primary consequence of diabetes is a reduced ability to fight infections. Also, the presence of an infection aggravates a diabetic condition, making it more difficult to control. The most typical aggravating result of an infection in a diabetic is an increase in the blood sugar. Once the blood sugar is elevated, the resistance to infection decreases even further. Thus, the relationship between diabetes and infection is circular. When a diabetic has an infection they must monitor their condition more closely than they do on a regular basis, and must make an extra effort to keep their blood sugar level down.

As most diabetics do, Kalsbeck monitored his diabetes at home, using chemical strips which test the amount of sugar being spilled over into the urine from the blood. The test does not give an accurate reading of the blood sugar level, since each diabetic has a different "spill threshold," i.e., they spill sugar into the urine at blood sugar levels which differ among diabetics. Nevertheless, for years it was the only practical way for diabetics to have any idea of their blood sugar levels without visiting a medical laboratory. In just the last few years, home blood testing kits became available so that many diabetics have now abandoned the less accurate urinalysis method.

The facts are not clear on how well controlled Kalsbeck's diabetes was. He had not been hospitalized except when he was initially diagnosed, and he rarely missed a day of work because of illness. However, he did not regularly inform Dr. Haight of the results of his urine tests, and he resisted the doctor's recommendation that he come in every 3 months to have a blood sugar taken. The few times he did come in to the office, his blood sugar was often elevated. The normal range for blood sugar is 70–120 mg. percent. On one occasion, Kalsbeck's blood sugar was 400, and another time it was 188. Dr. Haight testified that Kalsbeck was "basically fairly well controlled," and "reasonably well controlled." Again, one difficulty in determining whether a diabetic is in good control is that even consistently elevated blood sugars do not always noticeably affect their general feeling of well being and good health, (particularly in Type II diabetics.) Here, without a more detailed history of

Kalsbeck's blood sugar levels, it is impossible to know how well he managed his disease.

When Dr. Haight examined Kalsbeck on Monday, he took a blood sugar but did not get the results back until late that afternoon. When he did view the results, they showed that Kalsbeck had a blood sugar of 502. Upon learning this, Dr. Haight telephoned the Kalsbecks at home, and spoke with appellant. Dr. Haight testified that he was considering hospitalization for Kalsbeck, but he decided against it when appellant told him that she and Kalsbeck were not feeling any worse than they had been in the morning when they saw Dr. Haight. At trial, Dr. Haight testified that, since the antibiotics he had prescribed take some time before their effect is felt, and since Kalsbeck was not feeling any worse, he believed it was reasonable to wait until the next day before changing the treatment or hospitalizing Kalsbeck. In addition, Dr. Haight also questioned the accuracy of the blood sugar test, since the lab technician told him that the tests had been running high that day, and he had not expected Kalsbeck to have such an elevated blood sugar. This also influenced him in his decision not to hospitalize Kalsbeck at that time.

In his telephone call, Dr. Haight explained his concern about the elevated blood sugar to appellant, and advised her to force fluids on Kalsbeck, which, in addition to increasing the insulin dosage, is a method used to lower blood sugar levels. Dr. Haight did not speak with Kalsbeck, but only to appellant. He did not instruct Kalsbeck to increase his insulin dosage, or to get a follow-up blood sugar the next morning at the office, or to monitor his blood sugar through urine tests at home. Although Dr. Haight testified that he did tell appellant to either call him or bring Kalsbeck in to the office the next morning, appellant denies that he gave her any such instruction.

The next morning, Tuesday, Kalsbeck was still ill but apparently felt somewhat better. Appellant testified he told her his chest did not hurt as badly as it had. However, he had been sitting up most of the night because of the chest pain. Appellant, who was still feeling ill herself, fell asleep during most of the afternoon. When she woke up, she found Kalsbeck in a greatly deteriorated state. He was breathing rapidly and appellant felt "it just wasn't right". She then called Dr. Haight but talked instead to the doctor on call, Dr. Swanson. Dr. Swanson was originally a defendant in this case but the case against him was dismissed for lack of evidence. Dr. Swanson mistakenly understood appellant to say that she and Kalsbeck had seen Dr. Haight that same morning, rather than Monday morning, and Dr. Swanson therefore told appellant that since the antibiotics had not yet taken effect, it would not help Kalsbeck much to hospitalize him at that point. However, he also told her to take Kalsbeck to the hospital if he got any worse.

Appellant then went back to bed and was awakened by their son Tommy when he arrived home about 10:30 p.m. Kalsbeck had deteriorated even further and was disoriented and incoherent. Tommy and appellant took Kalsbeck to the hospital, arriving about midnight. He was put on a respirator and new x-rays were taken which revealed extensive pneumonia in both lungs by that time. The pneumonia had spread a great deal since the Kalsbecks saw Dr. Haight on Monday. Kalsbeck's blood sugar was then 800.

The hospital staff treated Kalsbeck with antibiotics which are effective against staph, but his condition did not improve. He went into respiratory arrest and sunk into a coma, followed by several cardiac arrests. He died about 2 o'clock on Thursday morning, about 26 hours after arriving at the hospital.

Approximately one year later, appellant filed this action as trustee for next-of-kin of decedent Thomas D. Kalsbeck, under the Minnesota wrongful death statute, Minn. Stat. § 573.02 (1984). Appellant alleged respondent Dr. Haight and his Westview Clinic were negligent in the care and treat-

ment of Kalsbeck on Monday, January 24, and that this negligence was the direct cause of Kalsbeck's death.

At trial, both sides offered expert medical testimony in support of their case. First, the experts disputed whether Dr. Haight used reasonable care in his monitoring of Kalsbeck's diabetes. Appellant's experts stated that Dr. Haight should have waited until the results of the blood sugar test were back before sending Kalsbeck home from the office. The test normally takes between 45 minutes to an hour to complete. With the results in hand, a diagnosis of bacterial over viral pneumonia would have been more likely. More importantly, it would have allowed Dr. Haight further opportunity and reason to discuss the effect of an infection on diabetes with Kalsbeck directly, and he could have begun his efforts to reduce the blood sugar immediately.

The experts likewise disagreed over whether Dr. Haight should have hospitalized Kalsbeck once he finally did get the test results showing a blood sugar of 502. Appellant's experts stated that a blood sugar that high means the diabetes is out of control and, particularly in light of the presence of an infection, hospitalization was mandated. Respondent's experts agreed that the blood sugar was markedly elevated, but stated that they often saw blood sugars that high in diabetics, and that hospitalization was not warranted. Rather, a follow-up blood sugar and close home monitoring by urine tests would be a reasonable course of treatment, unless and until the blood sugar continued to rise. All experts did agree that a closer monitoring of the blood sugar should have occurred.

Second, and hotly disputed, was the issue of whether Dr. Haight acted reasonably in choosing not to do either a "gram stain" or a "sputum culture" of fluid from Kalsbeck's chest. The tests would have more accurately identified the bacteria causing the · pneumonia. Appellant's experts focused on the aggravating condition of diabetes, testifying that the increased susceptibility to infection makes it a standard medical practice to obtain a culture in a diabetic suffering from pneumonia, even if it might not be necessary for every pneumonia patient. Again, appellant's experts claimed that they would have hospitalized Kalsbeck while the culture was obtained, in order to monitor any change in his pneumonia and to watch for interaction between the pneumonia and the diabetes. Their opinion was that, had Kalsbeck been treated with the appropriate antibiotic on Monday, the infection could have been arrested and Kalsbeck would not have died.

Respondent's experts relied primarily on the statistics indicating that only 1–3% of all bacterial pneumonias are staph, and that most of those occur in hospitalized patients. They stated that the standard medical practice was to treat such case empirically as Dr. Haight did, relying on clinical experience, and selecting antibiotics which are effective against 80–90% of all bacterias which cause pneumonia. They repeated that most family practitioners will never see even one case of staph. They also relied on the judgment of Dr. Haight that, since it was painful for Kalsbeck to cough deeply, it was unwise to put him through the stress of trying to cough up fluid from the lung which is needed for the culture. Finally, they stated that, even if Kalsbeck had received the appropriate antibiotic on Monday, he probably would have died anyway, given his reduced resistance against infection and the rapid and severe spread of the pneumonia.

Respondent's experts supported their theory by disagreeing with the conclusion that Kalsbeck even had staph. They testified that Dr. Haight was correct in thinking that Kalsbeck probably had the very common pneumococcal bacteria, and that his improvement on Tuesday morning showed that he was responding to the antibiotics given on Monday. They noted that gram stains and sputum cultures are not always conclusive and disagreed that the gram stain ultimately obtained in the hospital clearly indicated staph. They also pointed out that sputum cultures take between 24 and 48 hours to grow, so that,

even if Kalsbeck had had a culture done on Monday, the organism may not have been identified in time to save his life. Respondent's experts went on to say that in their opinion Kalsbeck died from a rare fulminant type of pneumonia, which is so severe and progresses so quickly that no form of treatment at any time would have prevented his death. One expert, a pulmonary specialist, testified that he had seen thousands of pneumonia cases in his practice, and only between 10 and 15 community-acquired staph pneumonias, of which 5 were fulminant. He stated that none of those 5 patients survived, even if they were young and hardy, and even if they had early treatment with an effective antibiotic.

By special verdict, the jury found no negligence by Dr. Haight, and so did not reach the issue of causation. Appellant's motion for a new trial was denied, and judgment was entered for respondent. On appeal, Laurel Kalsbeck contends that the trial court erroneously refused to give jury instructions on 1) finding that a medical practice which is customary may nevertheless be a negligent practice, 2) the law of informed consent, and 3) the law of loss-of-a-chance. She also appeals on the basis that the verdict is not supported by the evidence. She asks for a remand for a new trial on all issues.

## ISSUES

1. Did the trial court err in refusing to instruct the jury specifically that adherence to a custom of the medical profession may nevertheless constitute negligence?

2. Did the trial court err in refusing to instruct the jury on plaintiff's theories of informed consent and loss of a chance?

3. Does the evidence support the verdict?

## ANALYSIS

### I.

*Jury instruction*

Did the trial court err in refusing to instruct the jury that adherence to a cus-

tom of the medical profession may nevertheless constitute negligence?

The trial court has broad latitude in determining the propriety of a specific instruction. *Sandhofer v. Abbott-Northwestern Hospital*, 283 N.W.2d 362, 367 (Minn.1979). If it appears that a more specific instruction on a particular issue is necessary to enable the jury to intelligently determine the question, the trial court should observe the party's request. *Id.* at 367; *Hagen v. Snow*, 244 Minn. 101, 106, 69 N.W.2d 100, 103 (1955). Furthermore, a party is entitled to a specific instruction on their theory of the case if there is evidence to support the instruction and it is in accordance with applicable law. *Sandhofer* at 367; *Cornfeldt v. Tongen*, 262 N.W.2d 684, 698 (Minn.1977). Still, the reviewing court must view the trial court's charge in its entirety and from a practical and common-sense point of view. In *Lieberman v. Korsh*, 264 Minn. 234, 240, 119 N.W.2d 180, 184 (1962), the court said:

> [A]n appellate court should view the instructions as far as possible from the standpoint of the total impact or impression upon the jury. The real test is "what might the jury have understood from the language of the court?"

Thus, a new trial will not be granted where requested instructions are refused when the general charge fairly and correctly states the applicable law. *Cameron v. Evans*, 241 Minn. 200, 208, 62 N.W.2d 793, 798 (1954). Moreover, a general charge is preferable to a specific one, as it avoids the risks of overemphasizing one side of the case and of confusing the jury. *Id.* at 209, 62 N.W.2d at 799, *Sandhofer* at 367, *Manion v. Tweedy*, 257 Minn. 59, 64, 100 N.W.2d 124, 128 (1959).

The trial court instructed the jury using the basic definition of negligence and reasonable care found in 4 Minnesota District Judges Association Committee on Jury Instruction Guides, Minnesota Practice § 101 (2d ed. 1974) (hereinafter cited as JIG II):

> Since this case is based upon negligence, you should have the definition of negligence under the law at this time. Negli-

gence is the failure to use reasonable care. Reasonable care is that care which a reasonable person would use under like circumstances.

Negligence is the doing of something which a reasonable person would not do or the failure to do something which a reasonable person would do under like circumstances.

It also instructed the jury on the duty and standard of care required of doctors, using JIG II, 425 G–S:

In performing professional services for a patient, a doctor must use that degree of skill and learning which is normally possessed and used by doctors in good standing in a similar practice in similar communities and under like circumstances.

In the application of this skill, as has been stated, the doctor must use reasonable care. The fact standing alone that a good result may not have followed from the treatment by the defendant is not evidence of negligence or unskilled treatment.

A doctor is not a guarantor of a cure or a good result from his treatment. He is not responsible for an error in judgment in choosing between accepted methods of treatment.

■ Appellant contends that the trial court's general instructions did not adequately explain to the jury that any act, if done without using reasonable care, constitutes negligence, even if it was a customary act. The law in Minnesota is that, while proof of custom is relevant and helpful in determining negligence, a negligent act will not be excused by the fact that it is customary. *Scattergood v. Keil*, 233 Minn. 340, 343, 45 N.W.2d 650, 653 (1951), quoting *Anderson v. Fielding*, 92 Minn. 42, 45, 99 N.W. 357, 358 (1904). The observance of a custom or failure to observe it does not necessarily amount to due care or the lack of it, but such evidence is admissible as tending to show what a reasonably prudent person would do under the same or similar circumstances. *Schmidt v. Benin-*

*ga*, 285 Minn. 477, 490, 173 N.W.2d 401, 408 (1970).

Appellant would have benefited by a jury instruction explaining the rule from *Scattergood*. That rule was relevant to the case since the expert testimony frequently revolved around the fact that Dr. Haight's decision not to order a gram stain or a sputum culture was consistent with the practice of most family practitioners.

On the other hand, there was conflicting expert testimony on whether Dr. Haight's method *should* be accepted medical practice or not. Even one of respondent's experts, an infectious disease specialist, testified that although he recognized that most general practitioners do not obtain these tests, he believes it is good medical practice to use the tests, and has written articles trying to convince the profession to use the tests as a general practice. Medical textbooks were also read into evidence which supported this attitude.

■ The jury therefore heard evidence which raised the question of whether Dr. Haight's choice can or should be seen as a departure from reasonable care, even though it is a customary choice of general practitioners. This, along with the trial court's general instructions on the definition of reasonable care and on the requirement that doctors use reasonable care, should have been sufficient for the jury. The important factor for their consideration was whether Dr. Haight's act was a deviation from the duty of reasonable care under the circumstances, and not whether his act was consistent with the customs of general practitioners or whether the custom is itself negligent. As a whole, the instructions adequately prepared the jury to deliberate.

■ Given the trial court's wide latitude in its choice of jury instructions, the potential for improper emphasis when more specific instructions are used, and the fact that the general charge was an accurate statement of the applicable law, the trial court did not err in refusing appellant's requested instruction. Appellant's requested in-

struction would have been proper. However, failure to give it was not reversible error as the instruction given was also proper.

## II.

*Informed consent and loss of a chance*

Did the trial court err in refusing to instruct the jury on plaintiff's theories of informed consent and loss of a chance?

▇▇▇ The same standards of review regarding jury instructions that were applicable to the first issue are applicable to this second issue as well. Here the focus is on the rule that before a litigant is entitled to an instruction, there must be evidence to support the theory advanced, and the theory must be consistent with the applicable rules of law governing the rights and duties of the parties. *Manion v. Tweedy* 257·Minn. at 63, 100 N.W.2d at 127.

Appellant argues that the doctrine of informed consent, as announced in *Cornfeldt v. Tongen (Cornfeldt I)*, 262 N.W.2d 684 (Minn.1977), and as modified in *Cornfeldt v. Tongen (Cornfeldt II)*, 295 N.W.2d 638 (Minn.1980), applies to this case and thus it was error to refuse to instruct the jury on the doctrine. In *Cornfeldt I*, the court recognized a cause of action for "negligent nondisclosure of risks attendant to proposed or alternative methods of treatment." *Cornfeldt I* at 699.

▇▇▇ The doctrine applies in two situations. The first is when the patient must choose between the only accepted available treatment, where that treatment involves a risk, and no treatment at all. This does not describe the situation that Kalsbeck was in. The evidence showed that there were many different types of treatment that could have been prescribed, involving any combination of choices such as hospitalization, gram stain, sputum culture, increased insulin, increased fluids, additional or different antibiotics, follow-up blood sugars at regular intervals, etc.

Appellant argues that this abundance of choices shows that the facts here fit the other situation where the doctrine of informed consent applies. The doctrine applies when the patient must choose between two or more medically accepted alternative methods of treatment.

▇▇▇ The flaw underlying appellant's theory is that, rather than constituting alternative methods of treatment, the choices available to Kalsbeck were *additional* treatments. Had Dr. Haight disclosed all of the potential risks confronting Kalsbeck, Kalsbeck might have opted to be hospitalized. Perhaps he would have wanted Dr. Haight to take a culture. He might have wanted to be given additional antibiotics. But Dr. Haight would still have administered the treatment that he did give Kalsbeck, from the injection of Bicillin, to the taking of the blood sugar, to the advice that he check back with the doctor if there was no improvement in the next two days. The doctrine of informed consent does not apply to situations where the patient's decision is whether to submit to treatments in addition to the basic treatment given. Rather, it applies only to situations where the choice is between two or more distinct, alternative methods of treatment.

▇▇▇ While this holding is sufficient to affirm the trial court's refusal to instruct on the law of informed consent, we note that problems with appellant's theory also arise under the second strand of the rule regarding the propriety of specific jury instructions. There must be evidence to support the theory advanced. In *Kinikin v. Heupel*, 305 N.W.2d 589, 595 (Minn. 1981), where the court applied the *Cornfeldt* standard, it held that, besides risks of death or serious bodily harm, the doctor must also reveal risks "which a skilled practitioner in good standing in the community would reveal." None of the experts who testified at trial gave their opinion on whether such a practitioner would have disclosed the risks involved. They disagreed about how Dr. Haight should have treated Kalsbeck, but none of them stated that they would have explained all the alternatives and their accompanying risks to Kalsbeck before proceeding with their

treatment. Appellant's experts simply would have implemented more precautionary measures than Dr. Haight did. Appellant was not entitled to a specific instruction on the law of informed consent because no evidence was introduced to support the instruction and because such an instruction is not in accordance with the applicable law. *Sandhofer* at 367; *Cornfeldt I* at 698.

■ Appellant claims the trial court erred in not submitting to the jury an instruction on the medical malpractice doctrine of "loss of chance." Loss of chance involves the premise that a doctor, by doing something wrong, has decreased the patient's chance of survival (or even caused the death of a patient). *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978); *Hicks v. United States*, 368 F.2d 626 (4th Cir.1966).

We note that this doctrine has not previously been accepted or rejected in Minnesota. *Cornfeldt II* at 641 n. 4.

We do not reach the issue of whether Minnesota should now formally accept or reject loss of chance as the application of this doctrine arises only when negligence has already been established. Once a jury has found negligence on the part of a doctor, loss of chance is one of different theories a court can use to instruct a jury on the other needed threshold, i.e., proximate cause. In the case before us, the jury found no negligence on the part of respondent. Thus, the jury did not answer the special verdict as to whether such negligence was a direct cause of Kalsbeck's death.

■ Thus, we need not reach the issue of whether it was reversible error to omit the requested jury instruction on loss of chance.

### III.

*Sufficiency of the evidence*

■ Is there sufficient evidence to support the verdict?

The standard for reviewing jury verdicts is limited:

All testimony must be considered in the light most favorable to the prevailing party, * * * and a verdict will only be disturbed if it is "manifestly and palpably contrary to the evidence." * * * Review is even more limited when the jury verdict must consider the demeanor of the witness.

*Hunt v. Estate of Hanson*, 356 N.W.2d 323, 325–26 (Minn.Ct.App.1985), quoting *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 256 (Minn.1980). If the evidence reasonably tends to support the verdict, it will not be disturbed on appeal.

■ The evidence in this case has been presented in the fact statement and discussed in the context of the other issues raised on appeal. The jury heard extensive evidence from reliable experts for both parties. The jury had the benefit of a complete and well tried presentation of claims and defenses. There was expert testimony to support their factual finding of no negligence. There is sufficient evidence in the record to support that verdict.

### DECISION

The trial court's judgment for defendant and order denying a new trial are affirmed.