Jeffrey PRATT, a minor, by his father and natural guardian, Richard PRATT, and Richard Pratt and Christine Pratt, individually, Respondents,

v.

UNIVERSITY OF MINNESOTA AFFILIATED HOSPITALS AND CLINICS, et al., Richard A. King, Petitioners, Appellants.

No. C7–86–1806.

Supreme Court of Minnesota.

Oct. 30, 1987.

Greer E. Lockhart, Charles E. Lundberg and Donna J. Blazeric, Minneapolis, for U. of M. Affiliated Hospitals and Clinics, et al.

Laura J. Hanson and J. Richard Bland, Minneapolis, for Richard A. King.

Mark Hallberg, Minneapolis, for Jeffrey Pratt.

AMDAHL, Chief Justice.

Jeffrey Pratt, et al. (the "Pratts") appealed from an Order granting summary judgment in favor of the defendants (the "Doctors") in a negligent nondisclosure case on the grounds that the doctrine does not apply to mere diagnosis and that the Pratts lacked expert testimony on the issue of whether the Doctors departed from standard medical procedure by not informing them of conditions not diagnosed. The Pratts had originally also sued for medical malpractice. Summary judgment was granted on the malpractice claim for lack of expert testimony. That ruling was not appealed.

The court of appeals reversed the grant of summary judgment on the negligent nondisclosure claim, holding that the doctrine applies to genetic counseling and that the expert testimony requirement was satisfied. *Pratt v. Univ. of Minn. Affiliated Hosp.*, 403 N.W.2d 865 (Minn.App.1987). We reverse the court of appeals because, under the particular facts of this case, negligent nondisclosure is inapplicable. Since this ruling disposes of the case, it is not necessary for us to reach the issue of whether the Pratts had sufficient expert testimony to prove their case.

The facts are relatively straightforward. In February 1979, the Pratts sought genetic counseling to determine if the birth defects suffered by their third child (Andrew) were genetic in origin. The Pratts' first two children are normal. However, they were concerned about the risk of conceiving other children with birth defects.

The Pratts brought Andrew to Dr. King at the University of Minnesota Genetics Clinic. King took a family history and family pedigree. He examined Andrew and determined that Andrew suffered from multiple congenital abnormalities. King called in Dr. Gorlin to consult. Gorlin is not a member of the Genetics Clinic but occasionally consults with the clinic because of his particular expertise in genetic syndromes.

Based on the examination, neither doctor could fit Andrew into a defined syndrome. A chromasome study was ordered for Andrew to see if any abnormalities could be discovered. The chromosome study came back normal. On March 13, 1979, King again met with Mrs. Pratt. He told her that he was unable to specifically determine the cause of the defects. The Doctors concluded that Andrew's problems were of unknown origin. They determined it was most likely "a sporadic event without genetic implications, and there was little chance that it would happen again." The Doctors could not absolutely rule out other causes. However, based on their experience, they thought other causes unlikely because the normal chromosome study and Andrew's appearance weighed against other causes. This diagnosis was given to the Pratts. Based on the diagnosis, the Pratts were counseled that their chance of conceiving another child with birth defects were about the same as parents in general. No other counseling took place.

Specifically, the Doctors thought it unlikely that Andrew suffered from an autosomal recessive condition, a condition that, if present, has a twenty-five percent chance

of recurrence. The Pratts were not told of the risk of recurrence if Andrew did have an autosomal recessive condition because that condition was not diagnosed. King stated that if he had believed that Andrew suffered from an autosomal recessive condition, he would have advised the Pratts of the implications.

As fate would have it, the Pratts then had a fourth child (Jeffrey) who also suffered from birth defects.[1] The Pratts sued, claiming, *inter alia*, that the alternate possible causes of Andrew's anomalies should have been disclosed so they could make an informed decision on whether to conceive another child.

The issue in this case is a narrow one. It is simply whether the doctrine of negligent nondisclosure, as enunciated in *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn.1977), applies to cases involving genetic diagnosis. As a preliminary matter, it must be stated what this case is not. It is not a case of negligent care given by the Doctors. The Pratts originally sued for medical malpractice, but that claim was dismissed. Rather, the Pratts simply claim that, since the Doctors could not categorically eliminate alternative causes of Andrew's problems, they had a duty to disclose the risks inherent in each possible cause.

In 1977, this court first recognized the doctrine of negligent nondisclosure. *Cornfeldt*, 262 N.W.2d 684. In *Cornfeldt*, this court held that when there is a particular risk inherent in a treatment or procedure the doctor may have a duty to disclose it. *Id.* at 699.

> [A]n action for *negligent nondisclosure* will lie if the patient was not properly informed of a risk inhering in the treatment, the undisclosed risk materialized in harm, and consent to the treatment would not have been secured if the risk were disclosed.

*Id.* (emphasis in original).

The rationale behind this doctrine is that the right to be informed of the potential consequences of treatment performed is necessary to preserve patient free choice. *Id.* In Minnesota, informed consent has been applied in two basic situations. First, it applies when the patient must decide between the recommended treatment and no treatment at all. Secondly, it applies when a patient must choose between two or more medically accepted alternative treatments. *See Kalsbeck v. Westview Clinic, P.A.*, 375 N.W.2d 861, 869 (Minn. App.1985). This case presents an entirely new fact pattern which this court has not addressed. The Pratts contend that the doctrine should be extended to require disclosure of conditions not diagnosed after a diagnosis has been non-negligently made. We do not agree.

Only one reported case was found which addresses the present issue squarely. That case found no duty to disclose under similar circumstances. *See Karlsons v. Guerinot*, 57 A.D.2d 73, 394 N.Y.S.2d 933 (1977). In *Karlsons*, the plaintiff had given birth to a child with birth defects. The mother became pregnant again and sought counseling from the doctors. The doctors were told about the previous child and that the mother had a thyroid condition. The doctors did not inform her about the likelihood of giving birth to another child with birth defects. *Id.* at 75, 394 N.Y.S.2d at 934. Subsequently, the child was born with birth defects. *Id.* The doctors moved for and were granted summary judgment on the informed consent count. *Id.* at 76, 394 N.Y.S.2d at 935. This was upheld on appeal. The court noted that informed consent generally only applies to cases involving affirmative and invasive treatment. *Id.* at 82, 394 N.Y.S.2d at 939.

> [A] cause of action based upon this theory of liability exists only where the injury suffered arises from an affirmative violation of the patient's physical integri-

---

1. The court of appeals noted that the childrens' affliction was later diagnosed as an autosomal recessive disorder which has a 25% chance of recurrence. 403 N.W.2d at 867. However, the record is not conclusive on this point. The record merely reflects that both children suffer from genetic problems and that *if* they were caused by a recessive gene, there would be a 25% chance of recurrence. The record does not even clearly reflect that both children have the same disorder.

ty and, where nondisclosure of risks is concerned, these risks are directly related to such affirmative treatment. Here, the resultant harm did not arise out of any affirmative violation of the mother's physical integrity. Furthermore, the alleged undisclosed risks did not relate to any affirmative treatment but rather to the condition of pregnancy itself. Allegations such as these have traditionally formed the basis of actions in medical malpractice * * * and not informed consent. Special Term's dismissal of this cause of action is therefore affirmed.

*Id.*

 While the rule enunciated in *Karlsons* goes too far, it is applicable to the precise facts of this case.[2] We agree with the court of appeals that "treatment" should be construed broadly for the purposes of the negligent nondisclosure doctrine. We also believe that there may be some non-treatment situations where the doctrine could be applicable. As stated by one court:

> The patient's right to know is not confined to the choice of treatment once a disease is present and has been conclusively diagnosed. Important decisions must frequently be made in many non-treatment situations in which medical care is given, including procedures leading to a diagnosis, as in this case.

*Gates v. Jensen*, 92 Wash.2d 246, 250–51, 595 P.2d 919, 922–23 (1979). However, mere diagnosis, without more, does not give rise to a duty to disclose risks concerning conditions not diagnosed. For example, in *Gates*, the Washington court allowed an informed consent suit to continue where a doctor failed to inform the patient about additional and inexpensive tests for glaucoma. The doctor diagnosed the problem as eye irritation from contact lenses but could not rule out glaucoma. *Id.* at 248, 595 P.2d at 921. However, he never told the patient this or about additional tests that would make certain. Under those facts the doctor had a duty to inform the patient as a

choice could be made whether to submit to the tests.

Gates is readily distinguishable from the present case. Unlike *Gates*, the Doctors used all available tests and gathered all pertinent information in making their diagnosis. Thereafter they informed the Pratts of their conclusions and proceeded in a manner consistent with that diagnosis. Under the circumstances of this case, there was nothing more that could be done.

To say that the Doctors had a duty to disclose something more would, in effect, require them to inform the Pratts that their diagnosis might be incorrect. There is no logical stopping point to such a requirement. Such a rule could conceivably force physicians to inform patients of all risks associated with all conditions that were not diagnosed. To require physicians to list such a parade of horribles under these circumstances is not countenanced under either law or policy.

The Pratts attempt to avoid the result by arguing that this case deals with genetic counseling rather than mere diagnosis. However, that argument misses the issue. The Doctors *did* counsel the Pratts of the genetic implications based on their diagnosis that Andrew's birth defects were probably caused by a sporadic event. If the Doctors' diagnosis was negligently made or if the tests were negligently done, then the proper claim would have been for malpractice. There is no such claim before this court. Under the facts of this case, there was nothing further that the Doctors could counsel the Pratts on. Consequently, the court of appeals is reversed and the cause remanded for entry of judgment in accordance with this opinion.

COYNE, J., took no part in the consideration or decision of this case.

---

**2.** We do not agree with the court of appeals that *Karlsons* is distinguishable on its facts. *See* 403 N.W.2d at 869. The fact that Mrs. Pratt became pregnant after seeing the Doctors and the Plaintiff in *Karlsons* was pregnant at the time she

saw her doctors is legally irrelevant. It also makes no difference that New York has codified its informed consent doctrine. The codification in New York accomplishes no more than case law has done in this state.