Peter M. MADSEN, individually and as parent and natural Guardian of Justin R. Madsen, a minor, Appellants,

v.

PARK NICOLLET MEDICAL CENTER, Park Region, f.k.a. St. Louis Park Medical Center, et al., Respondents.

Nos. C1-87-1150, C0-87-1639.

Court of Appeals of Minnesota.

Feb. 16, 1988.
Review Granted April 20, 1988.

Lee R. Bissonette, Jeffrey W. Lambert, Larson & Lambert, Wayzata, for appellants.

Robert E. Salmon, Thomas L. Adams, Meagher, Geer, Markam, Anderson, Adamson, Flaskamp, & Brennan, Minneapolis, for respondents.

Heard, considered, and decided by LANSING, P.J., and NORTON and IVERSON,* JJ.

## OPINION

NORTON, Judge.

Appellant Peter Madsen, individually and on behalf of his son, Justin Madsen, brought a medical malpractice action alleging that negligent care of Justin's mother during pregnancy caused Justin to suffer severe and permanent physical disabilities. Following a jury verdict in favor of the defendant doctors and clinic, the trial court denied alternative motions for a new trial or judgment notwithstanding the verdict, and entered judgment according to the verdict. We reverse and remand.

## FACTS

Respondent Dr. Norman Solberg attended Robin Madsen, Justin's mother, during a pregnancy that ended successfully with a caesarian section delivery on March 22, 1982. On September 24, 1982, during a follow-up examination to check on Robin Madsen's reports of bleeding, Dr. Solberg determined that she was again pregnant. An ultrasound completed on September 27, 1982, indicated a gestational age of approximately 12 weeks. At her next scheduled visit on October 29, 1982, Robin Madsen again reported periodic bleeding, but the bleeding stopped in early November.

Early in the morning of November 30, 1982, Robin Madsen noticed a heavy watery vaginal discharge, and called Dr. Solberg, who told her to go to Methodist Hospital that morning. At the hospital, a nurse performed a nitrazine test to determine if the discharge contained amniotic fluid. The test was negative, but a second nitrazine test performed by the on-call physician was equivocal. Neither test conclusively indicated whether or not amniotic fluid had leaked, because even a negative test does not rule out the possibility of intermittent prior leaking. The hospital staff highly recommended that Robin Madsen be hospitalized to determine if her amniotic membranes had ruptured prematurely. She refused hospitalization, but attended a scheduled appointment with Dr. Solberg the following day.

During the December 1, 1982 visit, Dr. Solberg performed another nitrazine test, which was again negative for amniotic fluid, as was a test done on December 15, 1982. An ultrasound performed on December 22, 1982 showed a normal amount of amniotic fluid; however, because amniotic fluid regenerates, that result did not rule out the possibility of previous leaking.

At her scheduled December 29, 1982 appointment, Robin Madsen reported that she had continued to leak fluid, but was not bleeding or experiencing fever or chills. A nitrazine test indicated, for the first time, the presence of amniotic fluid, thus confirming the diagnosis of ruptured membranes. Neither party disputes that patients with ruptured membranes are at high risk for infection or premature labor. However, Dr. Solberg testified that those complications are less likely if leaking has continued intermittently for some time with no adverse consequences. The parties also disputed a number of facts concerning the December 29 appointment.

According to Robin Madsen, she was first examined by Dr. Solberg's nurse, Shirley Dixon, who obtained a positive result on the nitrazine test and then called in Dr. Solberg. Robin Madsen testified that she overheard them talking in the hallway about possible hospitalization, but she does not recall that anyone discussed hospitalization with her. However, Nurse Dixon testified that she would not have seen Robin Madsen that day, because she and Dr. Solberg alternated visits. In addition, if she had seen Robin Madsen, that fact would have been reflected in the patient chart, since when she sees patients she charts as she examines them.

Although Dr. Solberg had no independent recollection of the visit, his notes indicate that he discussed possible hospitalization, but because Robin Madsen had been leaking for some time and was feeling well, he told her to go home, rest, avoid intercourse or anything in her vagina, take

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

her temperature regularly, and come in promptly if she developed a fever or was sick at all. In addition, he testified that he was sure that they would have discussed ruptured membranes and Robin Madsen's condition quite specifically, and that he would have mentioned the risk of premature labor.

Robin Madsen, however, testified that Dr. Solberg had not told her that she was at risk to go into labor, and did not say that she had to be hospitalized. In addition, both she and Peter Madsen testified that Peter Madsen had accompanied her to the clinic that day to ask Dr. Solberg if Robin Madsen could go on a three-hour car trip to a planned family gathering in Morris, Minnesota on December 31. According to the Madsens, Dr. Solberg told them that she could go if they stopped when she had to go to the bathroom.

Dr. Solberg denied having discussed the trip at all, stating that such a discussion would have been noted in the medical records, that allowing her to go on the trip would have been inconsistent with his instructions to go home and rest, and that the advice to stop if she had to go to the bathroom was medically senseless. However, Robin Madsen observed that Dr. Solberg had told her that she could go home, not that she had to stay there.

Robin Madsen continued to leak fluid between December 29 and December 31, but did not notify Dr. Solberg or seek medical attention. According to Peter Madsen, she seemed "mopey" during the trip to Morris on December 31, and she testified that she began to experience cramping in her lower stomach about one-half hour after they arrived in Morris. She called the clinic and spoke to Dr. Petrini, who was a defendant in the action, but whose conduct is not at issue on appeal. According to Robin Madsen, Dr. Petrini told her to lie down and it would go away. However, Dr. Petrini testified that he had advised her to go to the emergency room of the Morris hospital.

Whatever she was told, Robin Madsen did not go to the hospital that evening. Rather, she spent a restless night, with intermittent pain. The next morning she felt a very sharp pain in her stomach, began bleeding profusely, and was taken to the Morris hospital at around noon on January 1, 1983. The pain and bleeding were caused by *abruptio placenta,* a condition in which the placenta separates from the uterine walls. According to the Madsens' expert, Robin Madsen had probably gone into premature labor on December 31, and the contractions probably caused the abruption of the placenta. However, a defense expert testified that the pains Robin Madsen experienced on the 31st were probably the beginning of the abruption, and that labor pains do not cause abruptions.

The doctor on duty at the hospital, a family practitioner, attempted to get Robin Madsen airlifted to a level-three hospital with a neonatal intensive care center, but was unable to obtain transportation. Confronted with Robin Madsen's hemorrhaging, he performed a caesarian section. There was no amniotic fluid in the uterine cavity when Justin was delivered, and Justin had Apgar scores of 2 at one minute and 2 at five minutes, out of a possible 10. Justin was later transferred to the neonatal intensive care unit in Fargo, North Dakota. He suffers from blindness in one eye, spastic quadriplegia, cerebral palsy, brain damage, neurological disorders, and impaired motor and cognitive skills.

With regard to the standard of care, the Madsens' experts testified that accepted medical practice for board-certified obstetricians required that Robin Madsen be hospitalized on December 29, 1982, when the first positive nitrazine test was obtained confirming that her membranes had ruptured. Dr. Solberg admitted that hospitalization was the accepted treatment, but testified that it was not required in this instance because leaking was ongoing, Robin Madsen was feeling well, and she had been told to come in immediately if any illness or fever developed. This testimony was supported by the testimony of one Dr. Farb, a board-certified obstetrician/perinatologist.

On causation, the Madsens' experts testified that had Robin Madsen been hospital-

ized on December 29, she might not have gone into labor at all, and if she had, she could have been transferred immediately to a level-three hospital. Because level-three hospitals are equipped and staffed to handle premature deliveries, Justin would probably not have suffered the birth asphyxia to which the Madsens' experts attributed his problems. Statistics cited by the Madsens' experts indicate that most of the surviving infants of Justin's gestational age who are born in level-three hospitals have no substantial permanent physical or mental impairments.

Defense experts disagreed, testifying that Justin's problems were primarily caused by prematurity rather than birth asphyxia, and thus were probably unavoidable. Dr. Farb also testified that even if Robin Madsen had been hospitalized on the 29th, she would not have been delivered until the abruption occurred on January 1, thus contradicting the Madsens' expert, who believed she would have been delivered as soon as possible after labor started. Finally, the defendants argued that had Robin Madsen followed Dr. Solberg's instructions to go home, rest, and come in if there were any problems, she would have been hospitalized on December 31 and could have been transferred to a level-three hospital when delivery became imminent.

At the close of the evidence, the trial court rejected the Madsens' proposed negligent nondisclosure instruction. With regard to Dr. Solberg's alleged negligence, the jury was instructed only on negligent treatment, and the negligence question on the special verdict form asked only if he had been negligent in the care and treatment of Robin Madsen. The jury returned a special verdict indicating that Drs. Solberg and Petrini had not been negligent in the treatment and care of Robin Madsen, and that such negligence was not a direct cause of Justin's injuries. They also found that Robin Madsen had not been negligent, and her negligence did not cause Justin's injuries. (Although the causation questions were to be answered *if* negligence *was* found, the jury answered them despite finding no negligence.)

The Madsens moved for judgment notwithstanding the verdict on the issues of Dr. Solberg's negligence and causation, or in the alternative for a new trial. Because we conclude that the Madsens were entitled to a jury instruction on negligent nondisclosure, we reverse and remand for a new trial.

## ISSUE

Did the trial court err in refusing to instruct the jury on informed consent/negligent nondisclosure?

## ANALYSIS

■ A party is entitled to a specific instruction on his or her theory of the case if there is evidence to support the instruction and it accords with applicable law. *Sandhofer v. Abbott–Northwestern Hospital*, 283 N.W.2d 362, 367 (Minn.1979). In this case, the Madsens requested an instruction on informed consent/negligent nondisclosure, reflecting their theory that Dr. Solberg's failure to advise Robin Madsen of the risks involved in going to Morris caused Justin's injuries, because if Robin Madsen had been fully informed of the risk of premature labor, she would have gone to the hospital or never would have left the Twin Cities area. The trial court refused to give the requested instruction on the grounds that the doctrine of informed consent/negligent nondisclosure does not apply to patient decisions concerning additional, rather than alternative, methods of treatment. *See Kalsbeck v. Westview Clinic, P.A.*, 375 N.W.2d 861, 869 (Minn.Ct. App.1985), *pet. for rev. denied* (Minn. Dec. 30, 1985).

The most recent supreme court negligent nondisclosure case left open the issue whether a negligent nondisclosure action can be brought where injuries result from nontreatment rather than affirmative treatment. *Pratt v. University of Minnesota Affiliated Hospitals and Clinics*, 414 N.W.2d 399 (Minn.1987). In *Pratt*, the doctors to whom parents had gone for genetic counseling concluded that a previous child's birth defects were not of genetic origin, but failed to inform the parents of the risks

of having another baby with defects if that diagnosis was wrong. *Id.* at 400–01. The *Pratt* court noted that the doctrine of negligent nondisclosure usually applies to cases involving affirmative treatment, but stated that "there may be some non-treatment situations where the doctrine could be applicable." *Id.* at 402.

In addition, although the court cited *Kalsbeck*, it implied that negligent nondisclosure might be applicable to some situations involving additional, rather than alternative, treatments. In particular, the court quoted *Gates v. Jensen,* 92 Wash.2d 246, 250–51, 595 P.2d 919, 922–23 (1979), which allowed an informed consent suit based on the doctor's failure to advise the patient about additional tests for glaucoma. The court implied that a duty to inform concerning additional treatments might arise where a patient can choose whether or not to submit to the additional treatments. *Pratt,* 414 N.W.2d at 402.

■ Under *Pratt,* it would therefore seem that where failure to obtain treatment would involve risks of which the doctor is or should be aware, and which a reasonable person would consider significant in deciding whether to submit to the treatment, the doctor should be liable for negligent nondisclosure if a reasonable person who knew the risk would have submitted to the treatment, and if the treatment would have avoided the injury. *See also Cornfeldt v. Tongen (Cornfeldt I),* 262 N.W.2d 684, 701 (Minn.1977); *Cornfeldt v. Tongen (Cornfeldt II),* 295 N.W.2d 638, 640 (Minn.1980).

Moreover, *Kalsbeck* does not preclude the application of the doctrine of informed consent/negligent nondisclosure to this case. In *Kalsbeck,* the doctor was confronted with an "abundance of choices" among many different types of treatment that could have been prescribed, and failed to tell the patient about any of them. *Kalsbeck,* 375 N.W.2d at 869. Although the *Kalsbeck* court held that the doctrine did not apply to require disclosure of information about an array of potential additional treatments, it reaffirmed that "[t]he doctrine applies when the patient must choose between two or more medically accepted alternative methods of treatment." *Id.*

■ This case did not present an array of additional alternative treatments; rather, the choice was between hospitalizing Robin Madsen or sending her home with strict instructions. Because, according to respondents, both alternatives were medically acceptable, the doctrine of negligent nondisclosure requires that Dr. Solberg should have disclosed the significant risks of each. Robin Madsen admitted that hospitalization might have been discussed, but also testified that Dr. Solberg did not tell her that she should be hospitalized, inform her about the risk of premature labor, or tell her not to travel. This testimony suffices to support a negligent nondisclosure instruction. Because the Madsens were entitled to an instruction on negligent nondisclosure, we remand for a new trial on that issue.

The Madsens also argue that the trial court should have entered judgment notwithstanding the verdict on the issue of Dr. Solberg's negligent treatment. We believe that the verdict was supported by competent evidence in the form of testimony by Drs. Solberg and Farb. *See Sandhofer,* 283 N.W.2d at 365.

■ Finally, we do not agree that the trial court abused its discretion in excluding evidence that Robin Madsen's status as an HMO member meant that her hospitalization could have adversely affected Dr. Solberg's profits. This evidence was only marginally relevant, and potentially very prejudicial. Even if evidence has probative value, Minn.R.Evid. 403 gives the trial court discretion to exclude it. *In re Commodore Hotel Fire & Explosion Cases,* 324 N.W.2d 245, 249 (Minn.1982). That discretion was not abused.

### DECISION

The failure to give an instruction on negligent nondisclosure requires a new trial on that issue.

Reversed and remanded.