Jeffrey **PRATT**, a minor, by his father and natural guardian, Richard **PRATT**, and Richard Pratt and Christine Pratt, individually, Appellants,

v.

**UNIVERSITY OF MINNESOTA AFFILIATED HOSPITALS AND CLINICS, et al., Richard A. King, Respondents.**

No. C7–86–1806.

Court of Appeals of Minnesota.

April 14, 1987.

Mark A. Hallberg, Hvass, Weisman & King, Chartered, Minneapolis, for appellants.

Greer E. Lockhart, Donna J. Blazevic, Bassford, Heckt, Lockhart & Mullin, P.A., Minneapolis, for respondents University of Minnesota Affiliated Hospitals and Clinics and Robert Gorlin.

Laura Jean Hanson, J. Richard Bland, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for Richard A. King.

Heard, considered and decided by HUSPENI, P.J., and FORSBERG and STONE, JJ.*

## OPINION

HUSPENI, Judge.

In this action for negligent nondisclosure in genetic counseling, the trial court granted respondents' motion for summary judgment, ruling that genetic counseling is not "treatment" within the scope of the doctrine of negligent nondisclosure, and ruling also that appellants failed to provide required expert testimony. We reverse and remand for trial.

## FACTS

The third child of appellants Richard and Christine Pratt, Andrew, was born on September 13, 1978, with various birth defects. On February 7, 1979, the Pratts went to the University of Minnesota Genetics Clinic for genetic counseling. They wanted to find out specifically whether Andrew's birth defects were of a genetic origin that would increase the likelihood of similar defects in any of their future children.

The Pratts were seen by respondent Dr. Richard King, the attending physician at the clinic. Dr. King took the Pratts' history, examined Andrew, and ordered chromosome tests. Based on the results of these procedures, Dr. King attempted to fit Andrew into one of three different genetic categories and to match him with a particular physical syndrome, but was unable to do so.

Dr. King then consulted respondent Dr. Robert Gorlin, a Regents Professor and Chairman of the Department of Oral Pathology and Genetics at the University of Minnesota. Dr. Gorlin, an expert on dysmorphic syndromes (syndromes involving physical abnormalities), was not a member of the Genetics Clinic staff and normally

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

was not involved in genetic counseling. After briefly examining Andrew, Dr. Gorlin told the Pratts that Andrew's anomalies were a "fluke happening." Dr. King similarly told the Pratts that Andrew's birth defects were most likely the result of a sporadic event and that there was little chance that any of their future children would suffer from such anomalies. As the Pratts left the clinic, Dr. King allegedly told them "Go ahead and have another baby." Dr. King later stated in his deposition that "I felt that this was a sporadic case, but we never can be sure."

Relying on the doctors' advice, the Pratts took no steps to prevent the conception of additional children. On May 3, 1982, Christine Pratt gave birth to appellant Jeffrey Pratt. Jeffrey was born with congenital anomalies similar to those of Andrew. As a result of these anomalies, both children need constant attention and can do nothing for themselves. Neither child can chew food, and both must be spoon-fed baby food at least three times a day. Jeffrey also suffers chronic seizures, often requiring that his parents revive him or summon paramedics.

The anomalies of both boys were later diagnosed as orofacialdigital syndrome type II and/or Dandy-Walker syndrome, an autosomal recessive disorder. When parents have a child with such a disorder, there is a twenty-five percent chance that their future offspring will be similarly afflicted. Although Drs. King and Gorlin were unable to rule out the possibility that Andrew Pratt suffered from an autosomal recessive disorder, they did not feel that the possibility was significant enough to warrant mentioning it to the Pratts. However, the doctors had been informed that the Pratts had sought genetic counseling specifically to explore the possibility of having another child. As Dr. Gorlin stated in his deposition, "one simply doesn't go into all the possibilities, [because it might] scare the patient regarding future pregnancies."

In August 1984, the Pratts filed a complaint against Doctors King and Gorlin, the University of Minnesota Affiliated Hospitals and Clinics, and two other doctors who were later voluntarily dismissed from the action, alleging medical malpractice and negligent nondisclosure. The trial court subsequently granted the doctors' motion for summary judgment on the medical malpractice claim only.

On April 9, 1986, Dr. Gorlin moved for a summary judgment on the negligent nondisclosure claim, and Dr. King joined in his motion. By an order dated May 28, 1986, the trial court granted the doctors' motion.

## ISSUES

1. Did the trial court err in granting respondents' motion for summary judgment on the basis that genetic counseling is not "treatment" within the doctrine of negligent nondisclosure?

2. Did the trial court err in granting respondents' motion for summary judgment on the basis that the Pratts failed to advance expert testimony?

## ANALYSIS

When a summary judgment is appealed, this court's function is to determine whether any genuine issues of material fact exist and whether the trial court erred in its application of the law. *See Grandnorthern, Inc. v. West Mall Partnership*, 359 N.W.2d 41, 44 (Minn.Ct.App.1984). Here, the trial court ruled that respondents would prevail as a matter of law on either of two bases: first, that genetic counseling does not constitute "treatment" within the doctrine of negligent nondisclosure; and second, that even if such counseling was "treatment," appellants failed to produce expert testimony showing that respondents' actions departed from standard medical practice. We will address each basis in turn.

### I.

In awarding summary judgment to respondents, the trial court declared that the doctrine of negligent nondisclosure applied only "when disclosure regarding a particular treatment was involved, and in cases where the disclosure involved the

choice between no treatment at all or a particular type of treatment * * *. [G]enetic counseling is not treatment that would give rise to a cause of action for negligent nondisclosure."

The issue on appeal is not whether appellants will or should ultimately prevail at trial. Appellants urge, however, that genetic counseling should be deemed treatment, and that whether the physicians here breached their duty to provide adequate genetic counseling is a material fact issue to be resolved at trial. In contrast, respondents argue that genetic counseling cannot be brought within the doctrine of negligent nondisclosure because genetic counseling cannot be brought within the definition of treatment.

"Treatment" has been broadly construed by other courts. The Iowa Supreme Court, for example, has stated that "treatment is broad enough to embrace all steps in applying medical arts to a person." *Head v. Colloton*, 331 N.W.2d 870, 875 (Iowa 1983). Similarly, the Missouri Court of Appeals has stated that treatment consists of the "measures necessary for the physical well-being of the patient." *Patrich v. Menorah Medical Center*, 636 S.W.2d 134, 140 (Mo. Ct.App.1982); *see also Stephens v. Williams*, 226 Ala. 534, 147 So. 608, 612 (1933) (holding that an allegation of "negligent treatment" encompassed negligence in performing an examination and diagnosis). These broad definitions of treatment clearly would include genetic counseling.

A broad definition of treatment has also been employed by several courts when construing hospitalization insurance policies. These courts have defined treatment to include "examination and diagnosis." *See, e.g., Hester v. Ford*, 221 Ala. 592, 130 So. 203, 206 (1930); *Bickel v. City of Chicago*, 25 Ill.App.3d 684, 689, 323 N.E.2d 832, 836 (1975); *Lucito v. Louisiana Hospital Service, Inc.*, 392 So.2d 700, 702 (La.Ct.App. 1980); *Simon v. Hospital Service Association of Pittsburgh*, 192 Pa.Super. 68, 74, 159 A.2d 52, 55 (1960); *Goodrich v. Tinker*, 437 S.W.2d 882, 884 (Tex.Civ.App.1969). *See also* Black's Law Dictionary at 1346 (5th ed. 1979) (stating that treatment in-

cludes "examination and diagnosis as well as application of remedies").

Here there is no question that respondents performed an examination and diagnosis of the Pratts and their son Andrew. They reviewed the Pratts' family medical history, took several photographs of Andrew, and performed blood tests and a chromosome study. Although the doctors were unable to definitely diagnose Andrew's anomalies, their actions still constituted an examination and diagnosis.

The question of what, in fact, constitutes treatment has never been addressed by the appellate courts of Minnesota although the doctrine of negligent nondisclosure itself has been the subject of case law discussion. A review of Minnesota cases which have recognized and addressed the doctrine of negligent nondisclosure reveals that the type of "treatment" embodied in those cases involved physical touching or invasion of the person. Respondents argue that treatment must always contain such elements. Appellants argue that a broader definition is needed.

In *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn.1977), the first case to recognize the doctrine of negligent nondisclosure as a distinct cause of action within the realm of medical malpractice, the plaintiff suffered from a perforated ulcer and emergency surgery was indicated. When preoperative tests were conducted, certain abnormal results were noted. Further tests could have been conducted to pinpoint the source of the abnormal results. However, none were ordered, nor was the plaintiff informed of the abnormal test results. Successful surgery was performed, but the plaintiff died from hepatitis several weeks later. In recognizing a "cause of action for negligent nondisclosure of risks attendant to proposed or alternative methods of treatment" the Minnesota Supreme Court discussed the theories of battery and informed consent in the context of the new cause of action, noting:

We have found doctors liable in battery for failure to secure the consent of a patient (citations omitted). An action for *battery* is appropriate where the treat-

ment consists of a touching that is of a substantially different nature and character from that to which the patient consented. * * * When the patient substantially understands the nature and character of the touching, an action for *negligent nondisclosure* will lie if the patient was not properly informed of a risk inhering in the treatment, the undisclosed risk materialized in harm, and consent to the treatment would not have been secured if the risk were disclosed.

*Id.* at 699. (Emphasis in original.)

In *Plutshack v. University of Minnesota Hospitals*, 316 N.W.2d 1 (Minn.1982), the supreme court held that to state a claim for negligent nondisclosure a plaintiff must demonstrate five elements:

(1) a duty on the part of the physician to know of a risk or alternative treatment plan; (2) a duty to disclose the risk or alternative program, which may be established by a showing that a reasonable person in what the physician knows or should have known to be the plaintiff's position would likely attach significance to that risk or alternative in deciding whether to consent to treatment; (3) breach of that duty; (4) causation (the undisclosed risk must materialize ' in harm); and (5) damages.

*Id.* at 9. *See also Kohoutek v. Hafner*, 383 N.W.2d 295 (Minn.1986); *Reinhardt v. Colton*, 337 N.W.2d 88 (Minn.1983); *Kalsbeck v. Westview Clinic, P.A.*, 375 N.W.2d 861 (Minn.Ct.App.), *pet. for rev. denied*, (Minn. 1985).

Respondents argue that the *Plutshack* elements only apply in a touching or physical invasion setting. Further, they cite *Karlsons v. Guerinot*, 57 A.D.2d 73, 394

N.Y.S.2d 933 (1977) as on point and urge that it be followed by this court. We find both respondents' and the trial court's reliance on *Karlsons* to be misplaced.[1] In *Karlsons* the appellate court affirmed the dismissal of an action brought against physicians who allegedly failed to inform plaintiff of the risks involved in her pregnancy (she suffered from a thyroid condition and had previously given birth to a handicapped child) or of the availability of amniocentesis testing which would have revealed that she was carrying a handicapped child. There was no indication in *Karlsons* that the plaintiff specifically sought counseling in order to decide whether to continue her pregnancy. All of the physicians' actions referred to in *Karlsons* occurred during the plaintiff's pregnancy,[2] not before conception. The *Karlsons* court's determination that the undisclosed risk was unrelated to any affirmative treatment is sustainable when tested against the facts of that case. By contrast, the facts here do show that affirmative treatment was involved. Appellants sought counseling to assist them in deciding whether to risk another pregnancy. There was no existing pregnancy at the time they sought that counseling. Contrary to the trial court's analysis, the facts here are not similar to those in *Karlsons*.

Respondents knew that appellants sought genetic counseling for one specific purpose and to receive the answer to one specific question: was there a chance that Andrew's tragic handicap could be genetic in origin? Appellants argue, in effect, that when the respondents were unable to rule out the possibility of genetic origin, they had a duty to disclose this inability to appellants because respondents knew or

---

**1.** The trial court memorandum, referring to *Karlsons*, stated:

The extension of the negligent nondisclosure doctrine to a counseling situation was considered in New York in a case with similar facts. In that case the patients were allegedly not informed of the probability of giving birth to a deformed child. * * * The court ruled that the undisclosed risks did not relate to any affirmative treatment but rather to the condition of the pregnancy itself and upheld the lower court's dismissal of that cause of action.

**2.** The court in *Karlsons* also noted that:

This decision is also in accord with the legislature's recent codification of a cause of action based upon lack of informed consent (see Public Health Law, § 2805–d) wherein it adopted a similar approach by limiting the doctrine to those cases involving "(a) non-emergency treatment, procedure or surgery, or (b) a diagnostic procedure which involved invasion or disruption of the integrity of the body" (Public Health Law, § 2805–d(2)).

*Id.* at 939 n. 4, 57 A.D.2d at 82–83. Minnesota has no comparable statute.

should have known that appellants would "likely attach significance to that risk." *Plutshack*, 316 N.W.2d at 9. Appellants further argue that respondents knew that if Andrew's condition in fact had a genetic origin, the chances were one in four that additional children would suffer from this same genetic condition, and that if respondents had informed appellants of these two facts, appellants never would have risked another pregnancy.

Health care choices of vast consequence can be made and implemented without an actual invasion of the patient's physical integrity. It is vital for patients in the situation of making such a choice to be able to base their decisions on as much information as possible. This is especially true in the area of genetic counseling. As one commentator points out, "it is usually only through physician disclosure that prospective parents will be given the opportunity to act to avert the birth of children with genetic defects," and "doctors should be required to inform prospective parents of all the genetic risks and reproductive options that a reasonable person would want to know in deciding whether to procreate." *See* Note, *Father and Mother Know Best: Defining the Liability of Physicians for Inadequate Genetic Counseling*, 87 Yale L.J. 1488, 1508 (1978) (footnotes omitted).

Another commentator also stresses the genetic counselor's duty to fully inform prospective parents of the risks involved in having additional children:

> [I]n genetic counseling the parents have a legal right to be fully informed decision makers about whether to have a child; and, likewise, the genetic counselor has a duty to convey to those he advises a clear and comprehensible picture of the options open to them, the relative risks and benefits, and the foreseeable consequences of each option, to the best of his ability.

Capron, *Informed Decision Making in Genetic Counseling: A Dissent to the "Wrongful Life" Debate*, 48 Indiana L.J. 581, 582 (1973). We conclude that respondents did reply to appellants' request for information that they required in order to make a major health care decision. In providing that information, we conclude that respondents did render treatment so as to bring this genetic counseling situation within the doctrine of negligent nondisclosure.

An examination of *Cornfeldt* persuades us that there is nothing in that opinion which mandates a definition of "treatment" so narrow as to exclude genetic counseling. Consideration of the five elements set forth in *Plutshack* further persuades us that appellants should have the opportunity to attempt to prove to a jury that respondents knew the risks involved for appellants in this counseling situation, that the respondents had a duty to disclose those risks because a reasonable person in what respondents knew or should have known to be in appellants' position would likely attach significance to those risks in deciding to conceive another child, that the respondents breached their duty, and that damage to appellants resulted.

## II.

Having determined that genetic counseling does constitute treatment so as to bring it within the doctrine of negligent nondisclosure, we must next determine whether the trial court erred in ruling that "even if counselling could be considered 'treatment', there has been no expert testimony advanced by plaintiffs that the [respondents] were departing from standard medical procedure in not informing [appellants] of the risks."

The Minnesota Supreme Court has held that expert testimony is required in negligent nondisclosure cases in order to establish three elements: (a) that a risk in fact exists, (b) that it is accepted medical practice to know of that risk, and (c) that it is more probable than not that the undisclosed risk materialized in harm. *Reinhardt v. Colton*, 337 N.W.2d at 96. Appellants here depended on the deposition testimony of respondents to meet the expert testimony requirement. First, respondents both testified that a risk existed. Both were aware of the possibility that Andrew might suffer from an autosomal recessive

disorder, and that such a diagnosis would indicate that the Pratts' future children would have a twenty-five percent chance of being similarly afflicted. We believe that for the purposes of determining whether the expert testimony requirement had been met the fact that the doctors did not believe this risk to be significant is irrelevant.

As to the second element, both respondents stated that they knew of the risk. Therefore, there was no reason to require a showing that it was accepted medical practice to know of the risk. Finally, the question of whether the undisclosed risk materialized in harm could be demonstrated through recognition that Jeffrey was born with the same anomaly as Andrew.

Through the deposition testimony of respondents King and Gorlin, it appears to this court that appellants satisfied the requirement that a claimant in a negligent nondisclosure case produce expert testimony.[3] We believe that the Minnesota Supreme Court recognized the unique nature of the role of expert testimony in negligent nondisclosure (informed consent) cases when it stated:

A majority of the jurisdictions that recognize a cause of action for negligent nondisclosure employs accepted medical practice in the circumstances as the standard of disclosure and requires expert testimony to establish that standard. * * * A growing number of courts, however, have adopted an objective test of informed consent, i.e., risks of a treatment or the existence of an alternative treatment must be disclosed to the patient if a reasonable person in what the physician knows or should have known to be the patient's position would likely attach significance to that risk or alternative in formulating his decision to consent to treatment. The objective test emphasizes patient self-determination in-

stead of the professional competence of the physician.

*Cornfeldt,* at 699–700 (footnotes omitted).

Further, the *Reinhardt* decision supports appellants' argument that they can produce sufficient expert testimony from respondents themselves. In *Reinhardt* the only negligent nondisclosure testimony came from the defendant. The supreme court stated:

As distinguished from a cause of action for negligent treatment, the role of expert testimony in establishing a prima facie case for negligent nondisclosure of risk is not as prominent. Under *Cornfeldt I,* expert testimony is necessary to establish that a risk in fact exists, and that it is accepted medical practice to know of that risk. *See Cornfeldt I,* 262 N.W.2d at 701–02. In addition, the plaintiff must introduce expert testimony to establish that it is more probable than not that the undisclosed risk did materialize in harm. *See Cornfeldt v. Tongen,* 295 N.W.2d 638, 640–41 (Minn.1980) (*Cornfeldt II*). The remaining elements of the cause of action for negligent nondisclosure of risk may be established without the aid of expert testimony.

Applying these principles to the case at bar, and giving the plaintiffs the benefit of the most favorable view of the evidence, we hold that the plaintiffs did introduce sufficient evidence to meet their burden of production in their claim of negligent nondisclosure of risk.

*Id.* at 96.

As in *Reinhardt,* appellants here seek to rely on respondents' testimony. The trial court found as a matter of law that appellants failed in their duty to produce that testimony. We cannot hold so narrowly, and conclude that summary judgment against appellants on this basis was erroneously awarded.

---

**3.** The Minnesota legislature recently passed Minn.Stat. § 145.682 (1986), requiring the plaintiff in a medical malpractice action to serve an affidavit upon each defendant, stating, inter alia, the identity of each expert witness expected to be called at trial. Section 145.682, subd. 4.

This statute was not yet in effect when this action was commenced. *See* Minn.Stat. § 645.-02 (1986) (unless a different date is specified, new statutes take effect on the August 1 following enactment).

### III.

Finally, respondent Gorlin asserts that even if negligent nondisclosure applies here and the expert testimony requirement was met, he did not participate in any genetic counseling and therefore had no duty toward appellants. The trial court made no finding as to the relationship between Dr. Gorlin and the appellants, and therefore such a determination is beyond the scope of this appeal. *See Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 68 n. 2 (Minn.1979) ("this court is limited to reviewing questions presented to and decided by the lower court * * *.") Furthermore, Dr. Gorlin's claim constitutes a factual issue, and the trial court may not grant a summary judgment where a genuine issue of fact exists. *See Donnay v. Boulware*, 275 Minn. 37, 45, 144 N.W.2d 711, 716 (1966).

### DECISION

By ruling that the theory of negligent nondisclosure cannot apply to genetic counseling situations and that appellants failed to produce expert testimony, the trial court erred in its application of the law.

Reversed and remanded.