CLEMENT GRAY *vs.* A. BILL KIEGER.

No. 88-P-805.

Middlesex. April 10, 1989. — July 18, 1989.

Present: ARMSTRONG, KAPLAN, & DREBEN, JJ.

*Negligence,* Medical malpractice. *Medical Malpractice,* Standard of care. *Practice, Civil,* Judgment notwithstanding verdict. *Damages,* Tort.

In a medical malpractice case, adequate expert testimony supported the jury's finding of negligence on the part of the defendant orthopedic surgeon [586-587], and sufficient nexus was shown between the negligence and the injuries suffered by the plaintiff to support the verdict. [588-589]

No reason appeared on appeal to disturb the award of damages in a medical malpractice action. [589]

CIVIL ACTION commenced in the Superior Court Department on March 2, 1982.

The case was tried before *Elizabeth J. Dolan,* J.

*James D. St. Clair (Mark G. Matuschak* with him) for the defendant.

*R. Robert Popeo (Rosemary M. Allen* with him) for the plaintiff.

KAPLAN, J. In this medical malpractice action, the jury, answering special questions, found in substantial part for the plaintiff. The defendant's appeal attacks the judge's denial of postverdict motions for judgment n.o.v. or a new trial.

1. *Facts.* Clement Gray, the plaintiff, nearly eighteen years old at the time, suffered severe injuries in an automobile accident in the early morning of December 4, 1976. Removed from his smashed vehicle by "jaws of life," he was taken to Framingham Union Hospital. The defendant, A. Bill Kieger, an orthopedic surgeon, was summoned, and he found among the plaintiff's injuries a dislocated hip, torn ligaments at the outside of the left ankle, and a small fracture of the left foot.

The upper edge of X-rays of the ankle taken on December 4 showed, although somewhat indistinctly, a cystic lesion of the lower tibia (shinbone). The plaintiff was fitted with a cast. X-rays taken on December 6 showed, again indistinctly because of the cast, rather more of the cystic field. The defendant did not note the lesion on the hospital record, nor did he order additional X-rays at the time.

The plaintiff left the hospital after ten days. On January 6, 1977, he visited the defendant as an outpatient. At the defendant's request, the plaintiff attended at the office of Dr. William A. Eddy, a radiologist, a short distance away. Dr. Eddy made X-rays through the plaintiff's cast, and the plaintiff returned that morning to the defendant's office carrying the X-rays. The lesion that was disclosed seemed to the defendant to be benign, but he could not make a definite diagnosis. He removed the plaintiff's cast. His entry in his medical record noted the lesion and called for a follow-up for further X-rays. The next day, January 7, 1977, the defendant received Dr. Eddy's report. It stated: "A bubbly lesion is seen in the midshaft of the tibia which is probably benign but not further studied at this time."

When the plaintiff left the defendant on January 6, 1977, free of the cast, he believed he was back to normal. He said he had been told nothing about any lesion. The defendant testified, to the contrary, that he had informed the plaintiff, but the medical record does not contain such an entry. As the plaintiff was leaving the defendant's office on January 6, he picked up from the receptionist an appointment card for February 17. He paid little attention to it and did not appear on the day. He resumed a vigorous life of which active participation in sports was an abundant part. Despite the follow-up entry, the defendant did not pursue the "no show," and thus the relationship ended.

Two years later, on March 3, 1979, the plaintiff, while skiing at North Conway, New Hampshire, "broke" his left leg. He was treated at the North Conway Memorial Hospital by Dr. Ralph Wolfe, and now, for the first time, the entire tibia was submitted to X-ray. A large lesion appeared, intersected or traversed by the fracture. This was a "pathologic" fracture,

as the bone was not normal and would fracture more readily than normal bone. The plaintiff, now in a cast, brought the X-rays and Dr. Wolfe's report to the defendant. According to the plaintiff, it was at this point that he became aware of the problem of the lesion. The defendant, continuing to conceive that the lesion was probably benign, decided to see the fracture healed before dealing with the lesion.

In April, 1979, worried about his situation despite the defendant's assurances, the plaintiff sought a "second opinion" from Dr. John Emans, II, an orthopedic surgeon at Children's Hospital, Boston. Dr. Emans corresponded with the defendant. He did not disturb the defendant's plan to defer the question of the lesion. On July 2, 1979, the defendant removed the plaintiff's cast. Dr. Emans had hoped that the tibia would "fill in" of itself, but in fact it was left in a rather weak condition where refracture was likely. Dr. Emans concluded that, to strengthen the limb, the lesion should be attacked by curettage, that is, by scraping the bone and filling in the space thus created by an "autograft" from the plaintiff's hip bone. Such an operation occurred on August 30, 1979, with the plaintiff remaining in the hospital for eight days. In the course of the procedure, Dr. Emans withdrew some of the diseased matter and sent it for pathologic analysis. This revealed that the patient had an adamantinoma, a very rare cancer of the bone, one of slow development, with a potentiality for metastasis to other parts of the body, in which event it could prove fatal. It is agreed that the cancer was already present in the plaintiff's tibia in 1976-1977.

Dr. Emans advised the plaintiff to consult Dr. Henry Mankin, chief of the orthopedic oncology unit at Massachusetts General Hospital, Boston, who had significant experience with adamantinomas and other malignant bone tumors. Until recently, adamantinomas were treated by amputation. Dr. Mankin, however, in this, as in his other cases, proceeded by "allograft," that is, by excision and replacement by stored bone taken from a cadaver (the whole being bound in by plate and screws). In Dr. Mankin's opinion the curettage was not appropriate for adamantinoma; indeed the effect might be to spill the cancer

into adjacent soft tissue. The excision in the plaintiff's case was generous (27 out of a length of 40 centimeters of bone) and removed the material that had been supplied by autograft, together with environs of soft-tissue.

The operation occurred in November, 1979, after which the plaintiff was largely immobilized for several months. At the time of trial in 1984, he was walking without a brace, but he had been advised to confine himself to the less hardy or jarring of physical activities. He was undergoing examination at six-month intervals for signs of recurrence of the cancer or its metastasis. None had been found to the time of trial. Prognosis by two of the experts was "guarded." According to Dr. Mankin, prognosis was "excellent."

2. *Issues at Trial.* The action was well tried by counsel and carefully managed by the judge, whose instructions are substantially unchallenged. In response to special questions, the jury found that the defendant was negligent in 1976-1977, but not negligent in 1979; and that the plaintiff was not negligent in missing the appointment on February 17, 1977. As noted, the defendant's appeal centers on the denial of the postverdict motions. The judge in her detailed memorandum of decision, applying the usual standards on these motions, held that the defendant had not shown the verdict to be vulnerable as to proof of duty, breach, causation, or damages.

(a) *Negligence.* Although the issue was disputed, adequate expert testimony (which, indeed, found an echo in the defendant's own testimony) supported the jury's finding of negligence — negligence understood during trial and described in the judge's instructions as lack of due care of an orthopedic surgeon in the sense of *Brune* v. *Belinkoff*, 354 Mass. 102, 109 (1968), and *Stepakoff* v. *Kantar*, 393 Mass. 836, 840 (1985).

On January 7, 1977 (and for a month before that), the defendant knew of a lesion in the lower tibia but did not know its actual extent in the bone or its essential nature. Undoubtedly, the lesion was an unnatural condition calling for inquiry and consideration of remedy. While its appearance on X-ray was consistent with the lesion's being benign, this did not exclude a probability of its being malignant, as in fact it was. The

catalogue of the various kinds of benign bone lesions is long, but so also is the array of the malignant; and among the latter, rare in occurrence but defined in the literature and known to the defendant, was adamantinoma, a dangerous adversary. It cannot be adequately diagnosed by X-ray but is found out through histologic (tissue) examination. By the lights of proper medical care, the jury could find a need for the analysis to have gone further than it did — this the defendant himself appears to have recognized, hence the entry of follow-up in the defendant's record and the appointment card for February 17. Here, it could be found, the defendant faltered. On the evidence before them the jury could say that, in light of the grave question left undecided and the serious dangers of inaction, the defendant was bound to pursue the no show and, if the plaintiff permitted (as the jury could infer he would), to continue the investigation until the scope and true consistency of the lesion were determined.

The jury could also find on disputed evidence that the defendant failed to give the plaintiff a timely warning of the existence of the lesion and the dangers it portended; this also was negligence. Since warning was not given, and the plaintiff could suppose that he was fully recovered by January 6, 1977, and that the appointment six weeks ahead was only a casual one to check again on the healing of the fracture, the jury could find the plaintiff not chargeable with lack of due care for his own safety.

. What has been said disposes of the defendant's claims to judgment n.o.v. or a new trial so far as these are aimed at the finding of responsibility on the defendant's part.[1]

---

[1] In considering the motion for judgment n.o.v., the judge cited and applied the standard set out in *O'Shaughnessy* v. *Besse*, 7 Mass. App. Ct. 727, 728 (1979); "When acting on a motion for judgment notwithstanding the verdict, courts are limited to the question whether, when all the evidence is considered most favorably to the plaintiff, 'the evidence is such that without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'" Regarding the motion for a new trial, the judge said "the court can consider the credibility of witnesses . . . and can further weigh the comparative strengths and weaknesses of the

(b) *Effects of negligence.* Assuming negligence, the defendant still contests "causation"; he says there was a lack of proved nexus between the negligence of 1976-1977 and any injuries suffered by the plaintiff.

Of course the defendant's negligence did not cause the cancer; that was the work of providence. However, the negligence did have severely injurious consequences. With proper care the cancer could have been discovered and taken in charge and treated at an early date.[2] Some two and a half years would have been saved. There was evidence that the lesion deteriorated by extending itself during that period. The broken leg and its sequelae until the cast was removed in July, 1977, were traceable to the defendant's lapse in diagnosing the cancer, as was the unfortunate autograft.[3] The jury could find that postponement of radical treatment of the cancer (and operation upon an enlarged lesion) increased, and at the time of trial still increased, the probability of metastasis.[4] The delay increased

---

case as presented. It is not required that the judge accept as true all of the evidence favorable to the prevailing party nor resolve all inferences in that party's favor. In view of all the evidence presented, did the jury fail to exercise an honest and reasonable judgment in accordance with controlling principles of law?"

[2] On this line the judge wrote that the jury could find "it is more likely than not that the defendant's actions or nonactions were a proximate cause of [the plaintiff's] sustaining more disability than he would have sustained had the tumor been determined to be malignant and treated directly in 1977."

[3] Under the judge's fairly general charge about causation, the jury could well find that any injury caused by the autograft, although performed by another hand, was traceable to the defendant's negligence. If the defendant wanted a more sedulous instruction, entering upon the considerations regarding causation developed in Restatement (Second) of Torts, c. 16, title C, §§ 440 et seq. (1965) (discussing intervening and superseding cause), he should have asked for such a charge. See *Cipollone* v. *D'Alessandro-Crognale, Inc.,* 333 Mass. 469, 475-476 (1956); *McCormick* v. *B. F. Goodrich Co.,* 8 Mass. App. Ct. 885, 887-888 (1979); *MacCuish* v. *Volkswagenwerk A.G.,* 22 Mass. App. Ct. 380, 397 (1986), *S.C.,* 400 Mass. 1003 (1987). Cf. *Modave* v. *Long Island Jewish Med. Center,* 501 F.2d 1065, 1072-1074 (2d Cir. 1974). At all events, the judge's negative rulings on the postjudgment motions appear correct even if the autograft is regarded as not a connected injury.

[4] The present case is quite different from *Payton* v. *Abbott Labs,* 386 Mass. 540, 544 (1982), where the court denied "a right of action for

the severity of that treatment when it occurred and affected the plaintiff's postoperative recovery (in addition it may have added to the restrictions that had to be imposed on the plaintiff's subsequent style of life). The physical invasions of the plaintiff so far as chargeable to the defendant were accompanied by emotional suffering or distress; to be included here was the anxiety, described in the evidence, that was felt by the defendant when he learned that true diagnosis of the cancer had been over-looked while it incubated over a considerable period of time.

3. *Damages*. The court said in *Mirageas* v. *Massachusetts Bay Transp. Authy.*, 391 Mass. 815, 822 (1984), quoting from *Bartley* v. *Phillips*, 317 Mass. 35, 43 (1944): "In this court as an appellate tribunal an award of damages must stand unless to make it or to permit it to stand was an abuse of discretion on the part of the court below, amounting to an error of law." *Mirageas* goes on to say, "An appellate court will not find an abuse of discretion in the judge's refusal to grant a new trial on the ground of excessive damages '[u]nless the damages awarded were greatly disproportionate to the injury proven or represented a miscarriage of justice,'" here quoting from *doCanto* v. *Ametek, Inc.*, 367 Mass. 776, 787 (1975). The trial judge wrote of the $750,000 verdict in the present case that it was not one "that resulted from inflamed emotion or sympathy on the part of the jury." We think she did not commit error in letting it stand. The defendant complains of the size of the verdict, but it is noteworthy that trial counsel did not take steps which might have focused the minds of the jury more sharply upon the question of damages — counsel did not apply to the judge to be more specific in her instructions on the compensable elements of injury (see the instance at note 3), or to allow a special verdict on damages itemizing the major elements. Nor did counsel venture to suggest to the judge the possibility of a remittitur.

*Judgment affirmed.*

emotional distress and anxiety caused by the negligence of a defendant, in the absence of any evidence of physical harm, where such emotional stress and anxiety are the result of an increased statistical likelihood [that] the plaintiff will suffer serious disease in the future."