**Anita Patenaude DUNNING,**
**Plaintiff, Appellant,**

v.

**Marvin S. KERZNER, M.D., et al.,**
**Defendants, Appellees.**

No. 89–1645.

United States Court of Appeals,
First Circuit.

Heard Jan. 9, 1990.

Decided Aug. 16, 1990.

R. Daniel Prentiss with whom R. Daniel Prentiss and Associates, Providence, R.I., was on brief, for plaintiff, appellant.

Alan R. Tate with whom Tate & Elias, Providence, R.I., was on brief, for defendants, appellees.

Before TORRUELLA, ALDRICH and CYR, Circuit Judges.

CYR, Circuit Judge.

In the present wrongful death action Anita Patenaude Dunning asserts a medical malpractice claim premised on Dr. Marvin Kerzner's negligent failure to diagnose the colon cancer which precipitated the death of her husband. Following a seven day trial in the United States District Court for the District of Rhode Island, the jury returned a verdict for the defendant physician. The plaintiff contends on appeal that certain misapprehensions concerning the scope of a physician's duty of care under Rhode Island law led the district court into a spate of prejudicial rulings which entitle her to a new trial.[1]

I

## BACKGROUND

Approximately once a year between 1972 and 1978, and again in 1982, plaintiff's decedent, Roger Patenaude, was seen by the defendant, a board-certified specialist in internal medicine. Patenaude's presenting complaints included, at various times, abdominal pain, nausea, gas build-up, and bloody stools. Numerous diagnostic tests were performed, including gastrointestinal and gall bladder series, as well as blood studies, with negative or normal results. Since the outset of the physician-patient relationship and until 1982, Dr. Kerzner attributed Patenaude's complaints to "irritable bowel syndrome."[2] In June of 1982 cancer was discovered in Patenaude's large intestine. Patenaude died less than three years later.

In January of 1975 the Lahey Clinic performed tests on Patenaude, including a barium enema. Three months later, during Patenaude's annual visit to Dr. Kerzner, Patenaude complained for the first time of intermittent blood in the stools. Dr. Kerzner performed a guaiac smear test on a stool sample, which did not indicate the presence of blood. Patenaude showed Dr. Kerzner a list of the tests performed at the Lahey Clinic, but the list did not indicate whether or not the barium enema had been performed with or without "air contrast," "air contrast" being the more sensitive technique.

---

1. At the outset, plaintiff insists that she was prejudiced by the denial of her motion in limine to exclude any reference to her remarriage following Mr. Patenaude's death, citing *Wiesel v. Cicerone*, 106 R.I. 595, 261 A.2d 889 (1970). Quite apart from the fact that the district court was not bound by state law on the issue of prejudice, it seems extraordinary that, having brought the suit in her new name, plaintiff should object to its use at trial. We leave it to the district court, in the first instance, to determine the admissibility of the evidence, after weighing its probative value against the danger of unfair prejudice under Federal Rule of Evidence 403. *See Doty v. Sewall*, 908 F.2d 1053, 1058 (1st Cir.1990).

2. Irritable bowel syndrome, sometimes called nervous stomach or spastic bowel, is a painful, nonlife-threatening condition involving accumulations of gas in the colon. Although irritable bowel syndrome does not cause bleeding, it is sometimes associated with hemorrhoids, which may have that effect. If the patient's symptoms include bloody stools, the presence of malignant polyps or tumors on the wall of the bowel (possible precursors of cancer) may be indicated. When blood is present, further diagnostic investigation is required to rule out cancer. Diagnosis may be facilitated through the use of a variety of techniques, including examination of the colon by proctosigmoidoscopy, colonoscopy, and air-contrast barium enema.

Patenaude visited Dr. Kerzner for routine physical examinations in January of 1976 and in April of 1977. Although Patenaude continued to report digestive disturbances, Dr. Kerzner's notes indicate no complaints of rectal bleeding.

In October of 1978 Patenaude informed Dr. Kerzner that he had been examined at the U.S. Public Health Service ("JFK Clinic") in May of 1978. Dr. Kerzner's notes state:

> He is also complaining of some pasty-type blood in his stools intermittently and did have a proctoscope ? sigmoidoscope exam with his government physical exam ... Records will be obtained. Question of repeat sigmoidoscopy will be discussed at that time.

Dr. Kerzner urged Patenaude to obtain the medical records relating to the physical examination at the JFK Clinic.[3] Patenaude did not do so.

Dr. Kerzner did not inform Patenaude of the medical implications of bloody stools, nor did he tell Patenaude that the bleeding could be a symptom of colon cancer. Dr. Kerzner himself continued to believe that cancer was the least likely diagnosis.

Dr. Kerzner testified that Patenaude was a nervous person and that he did not want to alarm him. He considered Patenaude an intelligent person who would follow through and obtain the information from the JFK Clinic.

Patenaude did not visit Dr. Kerzner again until some three and one-half years later, in February 1982. In June of 1982 Patenaude was diagnosed as having a moderately differentiated and invaded adenocarcinoma of the sigmoid colon, which was treated by surgical excision. In June 1983 examination revealed a large liver mass consistent with metastasis of the colon cancer. After unsuccessful chemotherapy, Patenaude died in April of 1985.

At trial, plaintiff called Dr. Kerzner to testify. When Dr. Kerzner was asked whether he had attempted to find out from the Lahey Clinic what type of barium enema had been performed and whether Patenaude had complained to the Lahey Clinic about bloody stools, the district court sustained defendant's objections.[4]

Plaintiff also called Dr. Jerome DeCosse, a specialist in bowel disease—in particular, cancer of the large colon—as an expert witness. Dr. DeCosse was asked to assume, *inter alia,* that Dr. Kerzner "strongly urged" Patenaude to have more diagnostic tests and to obtain medical records from the JFK Clinic, but that Kerzner had not followed through on Patenaude's failure to do so. Dr. Kerzner's attorney interposed an objection on the ground that the hypothetical was misleading.[5] Although the

---

**3.** Dr. Kerzner testified that he was unable to ascertain from Patenaude whether it was a proctoscope or a sigmoidoscope exam which had been administered at the JFK Clinic. The evidence revealed that sigmoidoscopy is more reliable than proctoscopy for diagnosing upper colon cancer, including cancer of the sigmoid colon. Dr. Kerzner considered it very important that Patenaude verify whether sigmoidoscopy or proctoscopy had been administered by the JFK Clinic.

Dr. Kerzner testified that he urged Patenaude to have a sigmoidoscopy, but that Patenaude said he did not want to repeat any examination which had already been performed at the JFK Clinic. Since Patenaude could not enlighten Dr. Kerzner as to whether a sigmoidoscopy had been performed, Kerzner urged Patenaude to obtain the information from the JFK Clinic. Patenaude agreed.

**4.** When plaintiff's counsel asked the basis for the ruling, the district court stated, in the presence of the jury: "It makes no difference and he had no responsibility to do that. If you want to

know what the reason is that's the reason.... [He had] no legal responsibility to make those calls to find out those things. He could rely on what the Lahey Clinic told him." Of course, one of the problems in the case is that the question put to Dr. Kerzner was designed to elicit information which could not be gleaned from the information provided by the Lahey Clinic.

**5.** The hypothetical question was as follows:

I'd like you to assume certain additional facts for the purpose of another question asking for your opinion: In addition to the facts that I've related to you I want you to assume that yesterday Dr. Kerzner testified that during that visit of October, 1978 he strongly urged Mr. Patenaude that he needed more diagnostic tests; that he asked Mr. Patenaude to obtain his medical records from the physical examination that is referred to in that note for October, 1978, and I want you to further assume that Dr. Kerzner testified that his of-

district court was not impressed with the basis offered by defendant's counsel in support of the objection, the following colloquy ensued:

THE COURT: Well, let's get to it. Is this witness going to tell us that this doctor had the duty to go out to the hospital and get that colonoscopy?

[PLAINTIFF'S COUNSEL]: He'll testify that this doctor had the duty to flag that file and to follow it up.

THE COURT: What would he do?

[PLAINTIFF'S COUNSEL]: He would write a letter specifically saying, within a month, specifically saying—

THE COURT: Have you got any case that says that he's got such a duty?

[PLAINTIFF'S COUNSEL]: I don't think this is a matter of law, Judge, I think it's a matter of opinion testimony.

THE COURT: Now wait a minute, this isn't a dictatorship at this point in time. This is a standard of care.

[PLAINTIFF'S COUNSEL]: That's right.

\*      \*      \*      \*      \*      \*

THE COURT: Well tell me what duty he had.

[PLAINTIFF'S COUNSEL]: He had the duty (1) to obtain the records, and (2) to make a specific focused communication to this patient to say, assuming what Kerzner said [concerning his request that Mr. Patenaude obtain his own records] is true, to say it is very important for you to obtain these records or to follow up on this. At least that's what he'll testify to.

\*      \*      \*      \*      \*      \*

I think that it's not a matter of law, that that, that the question of how far the doctor has to go to communicate to the patient, it's like the question of how much warning do doctors have to give to a patient. It is a question of fact and it's subject to expert opinion, your Honor, and this doctor will testify that given all

of those circumstances in that hypothetical Dr. Kerzner had a duty not to just let the file lie flat, that he had a duty to flag that file because this was a symptomatic patient with symptoms indicative of potential cancer which is a deadly disease, and he just couldn't let it go on. I think he's entitled to testify to that, that there is no rule of law that prevents it and that it is subject to opinion testimony.

THE COURT: I'm going to note your statement as an offer of proof and I'm going to sustain the objection.

Later, plaintiff was not permitted to cross-examine defendant's experts as to whether a physician in these circumstances should have followed through to obtain the necessary information from either the Lahey Clinic test or the JFK Clinic examination.

The court instructed the jury on the standard of care owed a patient by a physician, as follows:

The duty Dr. Kerzner owed to Mr. Patenaude was to exercise the same degree of deligence (sic) and skill in his diagnosis and treatment which is commonly possessed by other physicians in the same or similar localities, having due regard for the state of scientific knowledge at the time of treatment.

Medicine is an inexact science. The fact, therefore, if you find it as a fact, that Mr. Patnaude (sic) was injured as a result of the care he received from Dr. Kerzner does not mean that Dr. Kerzner was negligent. Dr. Kerzner can be found liable only if you find by a preponderance of the evidence that he failed to use the same degree of diligence and skill which is commonly exercised by other physicians under the same conditions in the same or similar localities, having due regard for the state of scientific knowledge at the time of the treatment.

---

fice had a routine practice of sending annual reminder letters to patients who were annual physical examination patients. Assume for the purpose of this question that all those facts testified to by Dr. Kerzner are true. Do you have an opinion to a reasonable degree of

medical certainty whether Dr. Kerzner, on the basis of all of those facts, whether his care of Roger Patenaude in October of 1978 and following conformed to the standard of care of the average qualified Board certified internist practicing in Rhode Island?

You must decide from the evidence which has been presented in this case what that duty of care is and whether or not the defendant in this case complied with that duty of care in treating Mr. Patnaude (sic). If you find that plaintiff has proved by a preponderance of the evidence that Dr. Kerzner did not act in accord with the duty of care, as you find it to be, in treating Mr. Patnaude (sic), then you may find that Dr. Kerzner breached his duty to Mr. Patnaude (sic) and acted negligently. Otherwise, plaintiff has failed in the proof and you must find for defendant.

One test that is helpful in determining whether or not a person was negligent and therefore breached a duty owed, is to ask and answer whether or not, if a person of ordinary prudence had been in the same situation as defendant, with the knowledge the defendant possessed or should have possessed through the exercise of ordinary or reasonable care, he would have foreseen or anticipated that someone was likely to have been injured by or as a result of his action or inaction. If such a result from certain conduct would be foreseeable by a person of ordinary prudence with like knowledge and in like situation, and if the conduct reasonably could have been avoided, then not to avoid it would be negligence.

Plaintiff requested the following instruction, which was refused by the court:

[In] instructing Mr. Patenaude to obtain his own medical records, Dr. Kerzner had the duty to explain to him the possible risks and hazards associated with that failure to obtain the records[,] in failure to follow up the symptoms of which he complained so that the patient could make an informed intelligent decision whether to follow Dr. Kerzner's prescribed course of conduct.

The trial court instructed the jury, over the plaintiff's objection:

Thus, you must consider the proximate cause of Mr. Patenaude's injury. Mr. Patenaude had a duty to follow instructions and undergo treatment prescribed for him which would prevent injury to

him. Thus, if you find that defendant gave instructions to Mr. Patenaude or prescribed treatment for him which would have had the effect of preventing injury to him, and that Mr. Patenaude failed to follow these instructions or to undergo the prescribed treatment, and that such failure was the cause of the injury to Mr. Patenaude, then your verdict must be for the defendant.

The jury returned a verdict for the defendant, and the plaintiff appealed.

## II

## DISCUSSION

In order to establish a *prima facie* tort claim the plaintiff must show by a preponderance of the evidence the existence of a duty, its breach, and injury proximately caused by the breach. *See Prosser & Keeton on the Law of Torts* § 30 (5th ed. 1984). Due care requires conduct in conformity with a general standard of care which is "the necessary complement of duty;" the general standard of care is a matter of law for determination by the court. *Id.* at § 37. Under Rhode Island law,

[i]n medical malpractice cases ... a physician's duty is not to cure, but to exercise the same degree of diligence and skill as physicians in good standing engaged in the same type of practice in similar localities ordinarily have and exercise in like cases. This standard of care governs a physician's conduct at all times while a patient is under his care and includes the diagnosis as well as the treatment of the patient's ailment.

*Schenck v. Roger Williams General Hosp.*, 119 R.I. 510, 382 A.2d 514, 517 (1977) (citation omitted). "With regard to the diagnosis of patient maladies," continued the Rhode Island Supreme Court, "we expounded upon the standard of care required of a physician by stating in *Wilkinson* that he must 'avail himself of all the scientific means and facilities available to him so that he can obtain the best factual data upon which he can make a diagnosis....'" *Id.* (quoting *Wilkinson v. Ves-*

*ey,* 110 R.I. 606, 615–16, 295 A.2d 676, 683, 69 A.L.R.3d 1202, 1210 (1972)). Thus, while a physician in making a diagnosis need not

> rule out any and all possible maladies to which the human race falls victim, ... in order to assess intelligently his patient's condition, a physician should employ the scientific advancements available to him. When a physician fails to conduct a test, consult a report, or perform an examination, i.e., utilize the scientific means of diagnosis at his disposal, *and there is competent evidence which indicates [that] other skilled physicians in similar localities would employ such resources,* the diagnostician is not employing the tools of his profession in the skillful manner required of him by law.

*Id.* 382 A.2d at 517–18 (emphasis added).

■ Although the general standard governing medical care is a matter of law for the court, it is for the jury to determine in the circumstances of the particular case whether the professional performance of the defendant physician measures up to the level of care normally accorded in the relevant medical community to patients in similar circumstances.

■ Under Rhode Island law, the level of skill and diligence necessary to meet the standard of medical care due the patient in the circumstances of a particular case ordinarily is established through expert testimony. "Evidence as to whether a physician has used proper skill and diligence in either diagnosing or treating one's ailment must be supplied by experts unless the lack of care is so obvious as to be within the layman's common knowledge." *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676, 682, 69 A.L.R.3d 1202, 1208 (1972) (emphasis added); *Marshall v. Tomaselli,* 118 R.I. 190, 372 A.2d 1280, 1283 (1977); *Young v. Park,* 417 A.2d 889, 893 (R.I.1980), *cert. denied,* 449 U.S. 1119, 101 S.Ct. 933, 67 L.Ed.2d 106 (1981); *Richardson v. Fuchs,* 523 A.2d 445, 448 (R.I.1987); *Nolan v. Kechijian,* 75 R.I. 165, 64 A.2d 866, 868 (1949). *See Coleman v. McCarthy,* 53 R.I. 266, 165 A. 900 (1933); *Bigney v. Fisher,* 26 R.I. 402, 59 A. 72 (1904).

■ Without expert testimony to establish the conduct required of a physician in the circumstances of the particular case, as well as proof that the defendant physician deviated from that standard of conduct, there can be no recovery on a claim of physician negligence under Rhode Island law. *Marshall,* 372 A.2d at 1283–84 (affirming directed verdict for defendant physician in the absence of expert testimony concerning the requisite standard of care or deviation from the standard); *Young,* 417 A.2d at 893 (same).

■ Rhode Island law plainly contemplates that the reasonableness of a physician's skill and diligence in caring for his patient must measure up to the practice of other skilled physicians in similar localities in like circumstances. *Schenk,* 382 A.2d at 517; *Wilkinson,* 295 A.2d at 682. The Rhode Island Supreme Court has stated that "[t]his standard of care governs a physician's conduct *at all times while a patient is under his care....*" *Schenk,* 382 A.2d at 517 (emphasis added). Yet, the Rhode Island Supreme Court has never directly considered whether its rubric governing a physician's duty of care comprehends follow-up care.

A few other courts have determined that a physician's duty of care comprehends follow-up care. *See, e.g., Truan v. Smith,* 578 S.W.2d 73, 100 A.L.R.3d 715 (Tenn. 1979) (court affirms plaintiff's verdict, holding that doctor did not account for failure to follow up); *Glicklich v. Spievack,* 16 Mass.App.Ct. 488, 452 N.E.2d 287 (1983) (reversing grant of judgment n.o.v. for defendant where physician's follow-up plan was inadequate) (alternative holding); *Squire v. Meyers,* 46 A.D.2d 694, 360 N.Y. S.2d 445 (1974) (court reinstates action, holding it a jury question whether defendants deviated from accepted medical practice in regard to diagnosis and follow-up).

We find no case which holds that a physician's responsibility to follow up is not governed by the same general standard of care that determines the level of skill and diligence due every patient from the inception of the doctor-patient relationship. Similar-

ly, we know of no case which has sustained a trial court's rejection of expert testimony proffered to establish the prevailing standard of medical care in the relevant locality on the ground that a physician's duty, as a matter of law, does not comprehend a responsibility to follow up.[6]

The primary theory of liability in the present case is simply that the doctor negligently failed to follow up on a patient who did not obtain medical records and information as the doctor directed.[7] On the other hand, most follow-up care cases involve a slightly different theory: the physician's failure to see the patient soon enough, to require the patient to return, or to request additional tests, and the like. Nevertheless, we are presented with no principled basis for excepting the present case from the normal rule that the conduct required of a physician in the circumstances of a particular case is measured by the level of diligence and skill customarily employed by other skilled physicians in the same locali-

ty, as established through expert testimony.[8]

The district court in the present case preempted the factfinding function by precluding expert testimony as to the degree of diligence and skill physicians in good standing engaged in the same type of practice in similar localities ordinarily exercise in these circumstances. Rhode Island law not only acknowledges the appropriateness of expert testimony to establish the measure of care ordinarily accorded patients by physicians in the same type of practice in similar localities, the Rhode Island Supreme Court has stated that expert testimony is required "unless the lack of care is so obvious as to be within the layman's common knowledge." *Wilkinson*, 295 A.2d at 893.

The plaintiff's expert, Dr. DeCosse, was not permitted to testify to what, if any, follow-up care customarily would be provided by other board-certified internists in

**6.** On the other hand, of course, numerous cases hold that a physician owes no duty in a particular case due to the absence of a doctor-patient relationship. *See, e.g., Doran v. Priddy*, 534 F.Supp 30, 33 (D.Kan.1981). There is no dispute that Patenaude was Dr. Kerzner's patient.

**7.** Although the theory of her case at trial rested on misdiagnosis as well, on appeal plaintiff simply asserts that the district court's rulings precluded her from demonstrating that the standard of care governing board-certified internists in these circumstances required that Dr. Kerzner contact Patenaude after Patenaude failed to obtain his medical records from the JFK Clinic, and after Patenaude failed to obtain the necessary information from the Lahey Clinic.

**8.** Several courts have admitted expert testimony concerning a doctor's duty to follow up by contacting a patient after the patient fails to carry out the doctor's earlier instructions. For instance, in *Smith v. Menet*, 175 Ill.App.3d 714, 125 Ill.Dec. 249, 530 N.E.2d 277 (1988) (reversing judgment against physician due to trial court's misstatement of standard of care as "good medical care" instead of "acceptable medical care"), the following "expert" testimony was admitted at trial:

'normally in a circumstance where there's an abnormal test and a patient does not follow up on it, either (sic) an attempt is made to reschedule the patient. If the patient cannot be contacted, then at least a letter is sent out to the address of last note on the record. Beyond that, I don't think a physician can

chase after the patient, but certainly that notification, either by phone or mail, is indicated.' *Id.* 125 Ill.Dec. at 253, 530 N.E.2d at 281. In *Davis v. Weiskopf*, 108 Ill.App.3d 505, 64 Ill.Dec. 131, 439 N.E.2d 60 (1982), the physician had information indicating the possible presence of a malignancy in the patient's knee. The court reversed the trial court's dismissal of a complaint alleging that the doctor had "[f]ailed to properly instruct plaintiff as to the urgency of follow-up medical care and treatment when defendant knew or should have known of the serious and ominous condition of plaintiff's [knee]." 64 Ill.Dec. at 132, 439 N.E.2d at 61. Although explicitly declining to consider the extent of the doctor's duty, the court in *Davis* noted that "[a] letter to plaintiff advising him of his condition ... might well have been sufficient [to guard against plaintiff's injury]." *Id.* 61 Ill.Dec. at 136, 439 N.E.2d at 65 (dictum). Finally, in *Gray v. Kieger*, 27 Mass.App.Ct. 583, 540 N.E.2d 1344 (1989), in upholding a plaintiff's verdict, the court observed that

adequate expert testimony ... supported the jury's finding of negligence.... On the evidence before them the jury could say that, in light of the grave question left undecided and the serious dangers of inaction, the defendant was bound to pursue the no show and, if the plaintiff permitted (as the jury could infer he would), to continue the investigation until the [nature of the condition indicated in the x-ray was] determined.

*Id.* 27 Mass.App.Ct. at 586–587, 540 N.E.2d at 1346–1347.

Rhode Island to patients presenting with Patenaude's symptoms in these circumstances.[9] Nor was plaintiff permitted to examine Dr. Kerzner, or to cross-examine Dr. Kerzner's experts, on the subject. Instead, the court announced in the jury's presence that the defendant owed no duty to follow up in these circumstances.

Finally, the jury instruction on proximate cause firmly closed the lid on any theory of liability in the case, including misdiagnosis, by directing the jury to find for Dr. Kerzner if it determined that Patenaude had failed to follow any instruction from Dr. Kerzner which would have prevented injury to Patenaude, and if the jury determined that such failure was the cause of Patenaude's injury. The jury having been precluded from considering whether Patenaude's death was proximately caused by Dr. Kerzner's failure to alert Patenaude to the risks of not obtaining the medical records,[10] or by Dr. Kerzner's failure to follow through, the jury instruction on proximate cause virtually directed a verdict for the defendant. In other words, the only cause left to consider was Patenaude's failure to do as Dr. Kerzner advised.

### III

### CONCLUSION

We can only conclude that the district court made rulings of law excluding qualified expert opinion. The scope of a physician's duty of care is normally for the jury, if properly supported, and while we well understand the district court's concern that the scope of the duty advocated by the plaintiff in the present case was highly

extended, we conclude that the court's exclusion of the proffered evidentiary support was error.

*The judgment of the district court is vacated, and the case is remanded for new trial.*

VACATED and REMANDED.

---

9. During the sidebar colloquy related above, *see supra* at 1012, Dr. Kerzner's counsel questioned Dr. DeCosse's qualifications to testify to these matters. Nevertheless, it is clear that the court's ruling was based on the ground that Dr. Kerzner owed no duty to follow up in these circumstances.

10. Plaintiff contends also that the district court erroneously refused her "informed consent" instruction. Rhode Island case law on "informed consent" speaks in terms of a duty to disclose material risks involved in "procedures" and "treatments". It seems that Rhode Island law would require disclosure of the risks attendant

to not accepting treatment as well. The Rhode Island Supreme Court, in *Wilkinson,* 295 A.2d 676, relied on *Canterbury v. Spence,* 464 F.2d 772, 782 n. 27 (D.C.Cir.), *cert. denied sub nom. Spence v. Canterbury,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), where the Court of Appeals for the District of Columbia noted that a physician must "generally inform[ ] the patient in non-technical terms as to what is at stake: the therapy alternatives open to him, the goals expectably to be achieved, and the risks that may ensue from particular treatment and no treatment." *See also Madsen v. Park Nicollet Medical Center,* 419 N.W.2d 511 (Minn.1988).